CONSERVATION LAW FOUNDATION, et al., Plaintiffs,

v.

James G. WATT, et al., Defendants,

Atlantic Richfield Company, et al., Intervenor-Defendants.

COMMONWEALTH OF MASSACHUSETTS, Plaintiff,

v.

James G. WATT, et al., Defendants,

Atlantic Richfield Company, et al., Intervenor-Defendants.

Civ. A. Nos. 83–0506–MA, 83–0530–MA.

United States District Court, D. Massachusetts.

March 28, 1983.

E. Edward Bruce, Washington, D.C., argued, for intervenors-defendants; Richard A. Merserve and Covington & Burling, Washington, D.C., on brief.

Robert R. Ruddock, New England Legal Foundation, and Greater Boston Chamber of Commerce, New England Council, Boston, Mass., on brief amicus curiae for all defendants.

Douglas I. Foy, Conservation Law Foundation, Boston, Mass., argued, for plaintiffs in No. 83–0506–MA; Alan Fryer, Donald Berry, and Cheryl Conner, Conservation Law Foundation, Boston, Mass., on brief.

Margaret Strand, Land and Natural Resource Div., U.S. Dept. of Justice, Washington, D.C., argued, for all defendants; Carol E. Dinkins, Asst. Atty. Gen., and Gary B. Randall, Land and Natural Resource Div., U.S. Dept. of Justice, Washington, D.C., on brief.

Stephen M. Leonard, Asst. Atty. Gen., Boston, Mass., argued, for plaintiff in No. 83–0530–MA; Francis X. Bellotti, Atty. Gen., Boston, Mass., and Lee Breckenridge, Asst. Atty. Gen., Nashville, Tenn., on brief.

Irwin I. Kimmelman, Atty. Gen. and Mary C. Jacobson, Deputy Atty. Gen., Richard J. Hughes, Trenton, N.J., on brief amicus curiae filed by New Jersey for plaintiff in No. 83–0530–MA.

John K. Van de Kamp, Atty. Gen., N. Gregory Taylor, Asst. Atty. Gen. and Theodora Berger, Deputy Atty. Gen., Los Angeles, Cal., on brief amicus curiae filed by California for plaintiff in No. 83–0530–MA.

MEMORANDUM AND ORDER

MAZZONE, District Judge.

This matter is before the Court on the motions of the plaintiffs, the Commonwealth of Massachusetts, the Conservation Law Foundation (CLF), and ten other environmental organizations and fishery associations for a preliminary injunction. The plaintiffs seek to enjoin James G. Watt, Secretary of the Interior (the Secretary), from conducting a sale of leases for the exploration, development and production of oil and natural gas in the Georges Bank region of the Outer Continental Shelf. The precise subject matter of the proposed lease

sale is 488 tracts encompassing some 2.8 million acres of North Atlantic seabed, located in waters from 86 to 164 miles off the coast of the northeastern United States. The sale, designated Lease Sale 52, is planned for March 29, 1983.

Georges Bank is a shallow submarine bank located on the outer continental shelf to the southeast of Massachusetts. Because of its particular oceanographic and geological features, it is an area of extraordinary biological productivity, and supports one of the most important commercial fisheries in the world. It can be divided into three separate regions: the continental shelf, a gently sloping portion of the continental margin extending seaward to a depth of some 200 meters; the continental slope, a steep, narrow area incised by a series of deep submarine canyons; and the less steeply inclined continental rise, continuing seaward into depths in excess of 2000 meters.

The currents and tides over Georges Bank are characterized by a general clockwise movement, or gyre. While the circulation is not entirely closed and exhibits some seasonal variation, the net exchange of water in the area is limited by this circulation pattern. Measurements in some locations have demonstrated mean residence times of more than two months. Within the gyre, in the shallow parts of the Bank, strong rotary tidal currents constantly move the sediment about and cause the overlying water to be vertically well-mixed throughout the year. Patterns of currents in the canyons along the continental slope, however, are more complex. Recent studies suggest that there may be a net deposition of sediment at the canyon heads. The Georges Bank region is subject to severe storms and high waves, particularly during the winter months.

These oceanographic features combine to make Georges Bank one of the world's most productive fisheries. The circulation pattern of the water and the turbulent mixing of the water column allows recirculation of eggs and larvae and provides high levels of nutrients for larvae. Consequently, it is a major spawning grounds for at least 26 different species of fish, many of which migrate seasonally from the Bank to Massachusetts coastal waters. Among the fish that spawn on Georges Bank are cod, haddock, herring, flounder, grey sole, silver hake and scallops. The deep canyons of Georges Bank provide a similarly unique habitat for other species, including lobster, squid, tilefish, shrimp, and coral. The lobster migrate to coastal waters in the spring and summer, returning in the fall.

Unlike most major fisheries, Georges Bank is contained entirely within the United States' 200 mile limit and, therefore, is subject to the protection and management of the United States. Massachusetts fishermen alone in 1979 harvested 363 million pounds of fish and shellfish with an ex-vessel value of $166,000,000. Given the economic multiplier of 4.24 (Council of State Governments, State Natural Resource Economics at 10 (1979)), the Massachusetts fishing industry generated nearly $708,000,000 in economic activity in the state. In New Bedford, the leading fishing port in the state, 93% of the catch in 1979 was caught on Georges Bank. *See* Brief of Commonwealth of Massachusetts, at 3–9 and sections of the Final EIS cited therein.

I note at the outset that the planned lease sale is not the first to be held in this region. Lease Sale 42, calling for bids on 123 tracts of 5693 acres each, was held on December 18, 1979 with the result that 63 tracts encompassing some 360,000 acres of seabed were actually leased. That sale, initially scheduled for January 31, 1978, was enjoined by this Court on January 28, 1978. *Massachusetts v. Andrus,* 11 ERC 1138 (D.Mass.1978) (Garrity, J.). The First Circuit declined to disturb that injunction on initial review. *Massachusetts v. Andrus,* 11 ERC 1147 (1st Cir.1978). Subsequently, Congress adopted significant amendments to the applicable leasing statute, the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.* (OCS Lands Act), and in view of the amendments, the First Circuit vacated the outstanding injunction in February of 1979. *Massachusetts v. Andrus,*

594 F.2d 872 (1st Cir.1979). Following further litigation before this Court and the Court of Appeals, and after a brief stay by Justice Brennan, Circuit Justice for the First Circuit, later vacated by the Supreme Court *en banc,* Lease Sale 42 was conducted, as noted above, on December 18, 1979. Exploration began in the fall of 1980 on certain of the leased tracts, and eight wells have been drilled. No discoveries of oil or natural gas have been made in the region.

I summarize briefly some of the lengthy administration process that has preceded Lease Sale 52. On December 31, 1979, the Bureau of Land Management of the Department of Interior issued a Call for Nominations and Comments on Lease Sale 52. On July 1, 1980, the Department announced its tentative tract selection for the sale, and in September, 1981 it released a Draft Environmental Impact Statement (Draft EIS). Numerous written and oral comments were received on the Draft EIS from interested public and private concerns, including extensive comments from the Commonwealth of Massachusetts and the Conservation Law Foundation.

In April of 1982, the Department of Interior issued the Final Environmental Impact Statement (Final EIS), as well as a Proposed Notice of Sale indicating that the sale would take place in August of 1982. At this time, then-Governor King and the Governors of all other affected states were asked, pursuant to section 19 of the OCS Lands Act, 43 U.S.C. § 1345, to submit recommendations regarding the "size, timing, and location" of Lease Sale 52. In his response, dated June 18, 1982, the Governor indicated:

Massachusetts has repeatedly expressed its specific concerns regarding the timing and extent of Sale 52 as proposed... The overriding objective of my recommendations is to protect, in a manner consistent with an aggressive energy policy, the rich and valuable resources of the Massachusetts coastal zone in general and its fishery in particular. While those resources are of tremendous significance to the citizens and economy of Massachu-

setts, they must also be viewed as precious *national* resources. Fish caught on Georges Bank and landed in Massachusetts provide an important source of food and nutrition to the entire nation.

The Governor recommended the deletion of 103 of the proposed 540 tracts in the sale block, and further recommended that the sale be delayed in order to permit consideration of the results of "key studies" already under way regarding the effect of oil and gas activity on Georges Bank. "Only then," he indicated, could "a prudent and properly informed decision be made regarding the scope of (i.e. tracts offered) and limitations on (i.e. lease stipulations) proposed Sale 52."

Lease Sale 52 was scheduled for August, 1982 in the proposed five-year outer continental shelf leasing program issued by the Department in May, 1982. This date was revised to October, 1982 when that program was finalized two months later. Further postponement was occasioned by the August, 1982 decision in *California v. Watt,* 683 F.2d 1253 (9th Cir.1982), *cert. pending* 82–1326, 82–1327, 82–1511, which indicated that outer continental shelf lease sales for oil and gas exploration fell within the scope of the Coastal Zone Management Act and required preparation of consistency determinations with the coastal zone management programs of the affected states. To allow the time necessary for the preparation of these consistency determinations, the Department of Interior again rescheduled Lease Sale 52, from October 1982 to March 1983. In November of 1982, the Department of Interior advised the Commonwealth of Massachusetts that it had analyzed Lease Sale 52 and had found it to be consistent to the maximum extent practicable with the state coastal zone management program. Massachusetts disagreed with this determination, and formally notified the Department to this effect by letter dated January 17, 1983. Further consultations between the Commonwealth and the Department were fruitless.

In January of 1983 the Department completed its preparation of an "environmental assessment" for Lease Sale 52. This was

done, according to the Department, "in order to review the original environmental analysis in light of new information, including results of studies relevant to the sale area and new resource and risk estimates that had become available since publication of the Final EIS." That document became available to the Massachusetts Coastal Zone Management Office on March 16, 1983, according to the affidavit of Patricia Hughes, Coordinator of outer continental shelf activities in that office.

A final Notice of Sale was published in the Federal Register on February 25, 1983, fixing a sale date of March 29, 1983. 48 Fed.Reg. 8236 (1983). That notice calls for bids on 488 of the 540 tracts included in the proposed Notice of Sale. These actions were brought on March 1, 1983, and the motions for preliminary injunction were filed on March 11, 1983. That same day, the Secretary of Interior provided the Governor with an explanation of why certain of his proposed tract deletions would not be adopted.

■ It is clear from the history of litigation between these parties and from the tenor of the briefs, affidavits, and arguments submitted to this Court that the subject of oil and gas exploration in the Georges Bank region has been treated exhaustively. Counsel are extremely competent and the record is extensive. It is not my task to consider, or reconsider, the wisdom of the Secretary's decision to hold this sale, or to re-cast whatever balance he may have struck between the significant competing considerations here involved. Rather, judicial review of administrative action is governed by the terms of the Administrative Procedure Act, 5 U.S.C. § 706. Agency action may be set aside, under the terms of the Act, if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A) &. (D). This review, while limited, is by no means cursory. I must "engage in a substantial inquiry," and make "a thorough, probing, in-depth review," in order to determine "whether the

decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Judicial review is not confined to alleged administrative or procedural errors:

> Its supervisory function calls on the court to intervene not merely in case of procedural inadequacies, or by passing on the mandate in the legislative charter, but more broadly if *the court becomes aware, especially from a combination of danger signals, that the agency has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making.*

*Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971) (emphasis added, footnote omitted). Further, the First Circuit has recognized that the Court's review extends to matters of technical expertise:

> [T]he Agency's technical conclusions no less than others . . . [must be] founded on supportable data and methodology, and meet minimal standards of rationality . . . While reviewing courts are not to substitute their judgment for an agency's, they are to establish parameters of rationality within which the agency must operate. A court would abdicate its function were it, when confronted with important and seemingly plausible objections going to the heart of a key technical determination, to presume that the agency could never behave irrationally. It has a duty to see that objections are faced in a proper procedural setting and satisfactory answers provided demonstrating careful agency consideration.

*South Terminal Corp. v. Environmental Protection Agency*, 504 F.2d 646, 655 & 665 (1st Cir.1974); *cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

The plaintiffs allege that in preparing for and scheduling Lease Sale 52, the defend-

ants have violated a number of statutory and common-law duties. Specifically, they allege that the Secretary has violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. (NEPA) by failing to prepare an adequate Environmental Impact Statement for Lease Sale 52; that the defendants have violated the Endangered Species Act, 16 U.S.C. §§ 1531 et seq. (ESA) by failing to utilize the best scientific data available and by reaching an unfounded conclusion that Lease Sale 52 is not likely to jeopardize endangered species; that the defendants have violated the Coastal Zone Management Act, 16 U.S.C. §§ 1451 et seq. (CZMA) by failing to demonstrate that Lease Sale 52 is consistent to the maximum extent practicable with the Massachusetts Coastal Zone Management Program; that the Secretary has violated his duty under the OCS Lands Act to minimize or eliminate conflicts between oil and gas exploration and the fishery industry; and finally, that the Secretary has violated his common law duty to protect the public lands of the people of the United States.

Turning to the standards which control this matter, the purpose of a preliminary injunction generally is to preserve the *status quo* between the parties pending a full hearing on the merits of their controversy. In determining whether a preliminary injunction should issue, the Court must consider four factors. These are whether the plaintiffs will suffer irreparable injury if the injunction is not granted, whether such injury outweighs any harm which granting injunctive relief would inflict on the defendants, whether the plaintiff has demonstrated a likelihood of success on the merits, and whether the public interest will be adversely affected by granting injunctive relief. *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). While each of these requirements must be satisfied, the First Circuit has noted that "the

probability-of-success component has loomed large in cases before this court." *Auburn News Co., Inc. v. Providence Journal Co.,* 659 F.2d 273, 277 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Because it has been the focus of the parties' arguments, and because I believe it is the key element in this controversy, I shall begin with this factor; that is, whether the Commonwealth of Massachusetts and the Conservation Law Foundation have established a sufficient likelihood of success on the merits of their specific claims for this injunction to issue.

I.

## LIKELIHOOD OF SUCCESS ON THE MERITS

### A. *National Environmental Policy Act*

The plaintiffs have alleged that the Environmental Impact Statement prepared in connection with this sale is inadequate, in that it is "out-of-date, lacks information which should be provided to the public concerning the sale, and presents misleading information about the sale."

Section 102(2) of NEPA, 42 U.S.C. § 4332(2), requires all agencies of the Federal government proposing "major Federal actions" to prepare "a detailed statement by the responsible official" addressing the environmental impact of the proposed action, as well as possible alternatives to the action and their respective environmental consequences. *Natural Resources Defense Council v. Morton,* 458 F.2d 827, 833–34 (D.C.Cir.1972).[1] The First Circuit has explained the purposes underlying this requirement in detail:

The 'detailed statement' required by § 4332(2)(C) serves at least three purposes. First, it permits the court to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard. To

---

1. The plaintiffs base their challenge under the National Environmental Policy Act on the procedures leading up to and content of the Final EIS. Other documents were prepared by the Secretary, including an "environmental assessment" and a Secretarial Issue Document. The

defendants correctly do not rely on these supplemental internal memoranda as "'curing' a deficiency in the FEIS. Rather, [they] maintain that the FEIS was adequate, and required no supplementation." Brief of Secretary Watt, at 22.

that end it must 'explicate fully its course of inquiry, its analysis and its reasoning.' Second, it serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project. To that end, it 'must be written in language that is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise.' It cannot be composed of statements 'too vague, too general and too conclusory.' Finally, and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind' not only fails to crystallize issues, but 'affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives.' Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response.

*Commonwealth of Massachusetts v. Andrus,* 594 F.2d 872, 883–84 (1st Cir.1979), *quoting Silva v. Lynn,* 482 F.2d 1282, 1284–85 (1st Cir.1973) (citations omitted).

■ The primary objection raised by the plaintiffs in the Final EIS is that it inadequately assesses the respective costs and benefits of proceeding with Lease Sale 52 or any of the proposed alternatives. NEPA requires that the EIS contain "a rather finely tuned and 'systematic' balancing analysis in each instance":

In each individual case, the particular economic and technical benefits of planned action must be assessed and then weighed against the environmental

costs... In some cases, the benefits will be great enough to justify a certain quantum of environmental costs; in other cases, they will not be so great and the proposed action may have to be abandoned or significantly altered so as to bring the benefits and costs into a proper balance.

*Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission,* 449 F.2d 1109, 1113 & 1123 (D.C.Cir.1971). On the basis of this and other authority, the plaintiffs argue that if the "full disclosure" mandated by NEPA were applied only to the environmental costs of a proposed action, and not also to the anticipated benefits, the purposes of the required balancing analysis would be defeated. *See Columbia Basin Land Protection Association v. Schlesinger,* 643 F.2d 585, 594–95 (9th Cir. 1981); *Natural Resources Defense Council, Inc. v. Morton, supra,* 458 F.2d at 833; *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 1001 n. 23 (5th Cir.1981).

The declared purpose of Lease Sale 52, as stated in the Final EIS, is "to find new domestic sources of oil and gas and to obtain an increased degree of national energy independence." Final EIS at 1. The anticipated benefits of the sale, therefore, are directly related to the amount of oil and natural gas to be found. At the time the Draft and Final EIS were prepared, the United States Geological Survey (now the Marine Minerals Service) estimated that "if the proposed sale area is hydrocarbon productive, it may contain from 0.017 to 6.35 billion barrels of oil and from 0.196 to 13.49 trillion cubic feet of gas." Final EIS at ii. The conditional mean estimates of recoverable resources were fixed at "1.73 billion [1,730 million] barrels of oil and 5.25 trillion [5,250 billion] cubic feet of gas." *Id.* However, in March of 1982, after the period for public and inter-agency comment on the Draft EIS had ended and immediately prior to publication of the Final EIS, the Department of Interior was provided with revised resource estimates based on results obtained from exploratory drilling in the Lease Sale 42 tracts. The revised conditional

mean resource estimates, as stated in an Addendum to the Final EIS, are 55.7 million barrels of oil and 280 billion cubic feet of gas. Final EIS at viii. These amounts are 3.1 percent and 5.3 percent of the amounts originally estimated; stated another way, the conditional mean estimated dropped approximately twenty-fold and thirty-fold respectively.

The law is clear that NEPA requires an environmental impact statement to contain a meaningful discussion and consideration of "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). Indeed, "the requirement for a thorough study and a detailed description of alternatives . . . is the linchpin of the entire impact statement." *Monroe County Conservation Council v. Volpe,* 472 F.2d 693, 697–98 (2d Cir.1972). The OCS Lands Act, adopted by Congress in specific contemplation of outer continental shelf leasing activity, expressly indicates that one of the three elements to be considered in conducting lease sales shall be "the potential for discovery of oil and gas." 43 U.S.C. § 1344(a)(3). To the extent that an analysis of costs and benefits was performed in the Final EIS for Lease Sale 52, and I note that the plaintiffs contest whether it was done at all, it is clear from the face of the document that it was performed on the basis of data now acknowledged to be seriously in error. The anticipated benefits of the sale as planned, in the form of mean estimates of recoverable resources, have dropped dramatically. Presumably the anticipated benefits from each of the nine alternatives presented in the Final EIS have been affected as well. And yet, nowhere in that voluminous and detailed document does this revised information, although acknowledged, become incorporated into the calculus of "particular economic and technical benefits" and "environmental costs" of the proposed sale and alternatives as required under the law. *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, supra,* 449 F.2d at 1113. As a result, the Court is unable to evaluate the Department's efforts to take into account the values protected by NEPA, the public is denied access to complete information as to the weighing of costs and benefits performed by the Secretary in reaching his decision, and the integrity of the decision-making process as a whole is threatened. *See Commonwealth of Massachusetts v. Andrus, supra.* The Final EIS describes the facts and circumstances of a lease sale that has become a fiction, and I must conclude that the "broad, informal cost-benefit analysis" required to be performed by the Secretary in that document no longer has particular relevance to Lease Sale 52. *See Sierra Club v. Sigler,* 695 F.2d 957, 978 (5th Cir.1983). Therefore, I find that the Final EIS is inadequate under the standards set forth in the National Environmental Policy Act.

The defendants have stated a number of responses to the plaintiffs' argument that the Final EIS is inadequate. They note that regulations promulgated by the Council on Environmental Quality establish a duty to issue a supplemental environmental impact statement only when "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c)(1)(ii), and suggest that a decrease in expected resources, such as has happened here, is not a "significant new circumstance . . . relevant to environmental concerns." If anything, they argue, the reduced resource estimates will lead to a decrease in expected environmental impacts. The defendants also direct this Court's attention to *California v. Watt, supra,* where the Secretary's failure to supplement a Final EIS in the face of significantly increased resource estimates was found to be reasonable. In that circumstance, the defendants note, the potential for environmental harm arguably increased; here, the estimates have been revised downward, and suggest a decreased potential for environmental damage. As much as their arguments may have some superficial appeal, I believe the defendants have read both the regulations and the decision of the Ninth Circuit far too narrowly. First, the regulations governing supplementation of a Final EIS do not address only "new circumstances

... relevant to environmental concern." The agency is further directed to prepare a supplemental environmental impact statement when "the agency makes substantial changes in the proposed action that are relevant to environmental concerns," 40 C.F.R. § 1502.9(c)(1)(i); and "when the agency determines that the purposes of the [National Environmental Policy] Act will be furthered by doing so," 40 C.F.R. § 1502.9(c)(2). It is apparent that a change, by several orders of magnitude, in the benefits to be obtained from a proposed action amounts to "substantial changes in the proposed action," directly relevant to the reasoned decision-making and balancing of environmental cost against economic benefit that NEPA requires. Second, while it is true that the Ninth Circuit did not require a supplemental environmental impact statement when the estimated resources were revised upwards, their reasoning does not necessarily apply to this situation. The possibility of finding significantly increased resources, without more, argues in favor of holding the lease sale. It lends further support to the Secretary's decision. Conversely, the possibility of finding significantly diminished resources argues against holding the lease sale as planned. It undercuts the Secretary's decision. The plaintiffs have persuaded me that the Final EIS is inadequate, not because it necessarily fails to state the full extent of possible environmental impacts, but rather because it fails to describe, in a reasoned fashion, the proposed sale and its alternatives in the context of realistic resource estimates. "Environmental impact statements shall be analytic rather than encyclopedic." 40 C.F.R. § 1502.2(a). A quantum of risk of environmental damage that might be acceptable in one scenario might be wholly unacceptable in another. NEPA does not strike this balance for the Secretary, but it does require him to identify clearly and publicly the factors that entered into his consideration. As the Commonwealth of Massachusetts has argued:

There is simply no indication here that the Secretary 'considered' the sharply reduced resource estimates in undertaking the balancing required by NEPA.... If another Saudi Arabia exists out there, then foregoing the oil means one thing. If there is a marginal to non-existent field, then it means quite another. The whole point of the procedural requirements of NEPA is to force a decision-maker to look hard at the pros and cons of what he is doing. If, notwithstanding that the best information tells him there are miniscule amounts of oil and gas resources in the north Atlantic, Secretary Watt nevertheless thinks it is worthwhile to run the risk of environmental harm to the area in order to determine precisely what is out there, then he should be made to say that. Only then can the public and the courts judge the wisdom and the legality of his course.

Brief of Commonwealth of Massachusetts, at 21–22.

### B. *The Endangered Species Act*

The plaintiffs have challenged proposed Lease Sale 52 on grounds that the Secretary's conduct in planning the sale fails to meet the procedural and substantive standards established by the Endangered Species Act. They argue that pursuant to the terms of the Act and regulations promulgated thereunder, Secretary Watt is obligated to "insure that any action authorized, funded, or carried out ... is not likely to jeopardize the continued existence of any species." 16 U.S.C. § 1536(a)(2). Such "jeopardy" has been deemed to occur whenever an activity "reasonably would be expected to reduce the reproduction, numbers, or distribution of a listed species to such an extent as to appreciably reduce the likelihood of the survival and recovery of that species in the wild." 50 C.F.R. § 402.02.

In determining whether an endangered species is placed in jeopardy, the Endangered Species Act requires that "each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The First Circuit has stated that compliance with this requirement requires a "first class effort" on the part of the agency, including the performance of "any ... tests and stu-

dies which are suggested by the best available science and technology." *Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency,* 684 F.2d 1041, 1052 n. 9 (1st Cir. 1982).

■ It is argued by all the parties that a number of endangered or threatened species inhabit or migrate through the proposed lease sale area. These include six species of whales, three species of sea turtles, and several species of birds and fish. A number of studies have been commenced by the Department of Interior in order to determine what effect the proposed oil exploration will have on the survival of these species. Three research programs in particular are cited by the plaintiffs as bearing directly on this question: the Cetacean and Turtle Assessment Program (CETAP), conducted by scientists at the University of Rhode Island to determine the distribution and behavior of endangered whales and turtles in the lease sale area; the Biological Task Force study, conducted by an interagency task force established in conjunction with Lease Sale 42 to recommend measures necessary to protect the ecosystem and fisheries of Georges Bank; and an Environmental Studies Program, operated by the Bureau of Land Management to determine the effects of oil and of noise associated with outer continental shelf exploration on marine mammals. It is difficult to conceive of scientific studies more directly relevant to a complete determination as to whether an endangered species would be jeopardized, and yet, neither the Biological Opinion required by the Endangered Species Act and rendered by the National Marine Fisheries Service, nor the Final EIS incorporates the final results of any of these studies.

The defendants have argued that, indeed, the Biological Opinion and Final EIS could not include this data, because much of it was not available when these documents were completed. However, in making this argument, I believe the defendants misconstrue the obligations established by the very terms of the Endangered Species Act. The

studies that have been commenced are demonstrably feasible, and some of them are essentially complete. As I have noted, it is beyond question that they are relevant to the proposed lease sale. They are, therefore, well within the definition of "best scientific data available" as established by the Act and recognized by this Circuit. Further, the obligation of the Secretary to comply with the Endangered Species Act and with NEPA does not end with preparation and promulgation of a Final EIS. *Monarch Chemical Works, Inc. v. Exon,* 452 F.Supp. 493, 500 (D.Neb.1978). Rather, his duty is ongoing, and I find that, in this instance, that duty required the Secretary to consider these "as yet untapped sources of 'best scientific and commercial data.'" *Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency, supra,* 684 F.2d at 1055. To paraphrase the holding of the First Circuit, it may well be that, after conducting these studies, and any other tests and studies which are suggested by the best available science and technology, the most informed judgment of risk of jeopardy to an endangered species will still have a large component of estimate, its quantitative element being incapable of precise verification. But at least the Secretary will have done all that was practicable prior to approving a project with such potentially grave environmental costs. *See Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency, supra,* 684 F.2d at 1055.

■ The defendants seek to distinguish the First Circuit's decision in *Roosevelt Campobello* on grounds that all significant available information was used at the time these documents were prepared and, also, that there will be further opportunity for a second look before the next stage of the program is commenced. However, the record shows that there is significant information in the studies at this time which is insubstantial conflict with both the Final EIS and the National Marine Fisheries Service Biological Opinion. *See,* Final EIS at 103–08, 238–46; National Marine Fisheries

Service Biological Opinion (Defendants' Exhibit 11). In addition, the CETAP Final Report, issued in December of 1982, is in direct conflict with the information that was before the Secretary regarding the location, population and status of certain endangered species, including the sperm and sei whales. The Secretary was aware that the studies were on-going. They had been commissioned and awarded prior to the issuance of the Final EIS in April, 1982. Since the Secretary proceeded without this information, he did not do "all that was *practicable* prior to approving a project with such potentially grave environmental costs." *Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency, supra,* 684 F.2d at 1055 (emphasis added).

■ The plaintiffs have also argued that the Endangered Species Act imposes certain substantive obligations upon the Secretary in his conduct of Lease Sale 52. The Act provides that agencies must "use ... all methods and procedures which are necessary" to preserve endangered species. 16 U.S.C. §§ 1531(c), 1532(2). The Supreme Court has acknowledged that both the language and the legislative history of the Act "reflect a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies ... the Act is substantive in effect, designed to *prevent* the loss of any endangered species, regardless of the cost." *TVA v. Hill,* 437 U.S. 153, 155 & 188 n. 34, 98 S.Ct. 2279, 2282 & 2299 n. 34, 57 L.Ed.2d 117 (1978) (emphasis in the original). Under the requirements of the Act, expressly found by the Supreme Court to "admit of no exception," *TVA v. Hill, supra,* 437 U.S. at 173, 98 S.Ct. at 2291, it is plain that in order to proceed with Lease Sale 52, Secretary Watt must establish that his actions will not jeopardize the continued existence of any endangered species. For several reasons, I find that the Secretary has failed to do so.

First, I find that the Secretary's failure to use the best available scientific information, while a violation of the procedural component of the Endangered Species Act, is also a violation of its substantive mandate. In not awaiting the analysis to be provided by studies that were already under way, indeed studies that were commissioned by the Department of Interior in connection with this very sale, I find that the Secretary has simply not used "all methods and procedures" at his disposal to insure the protection of endangered and threatened species.

Second, I find that the materials relied upon by the Secretary in purported compliance with the mandate of the Endangered Species Act do not support the conclusion stated in the Final EIS that no jeopardy is likely. The Biological Opinion prepared for the Secretary by the National Marine Fisheries Service states candidly that "the activities associated with the exploratory phase ... may have impacts on endangered species," and concludes that it is "unable to identify a threshold of [outer continental shelf] activities in the North Atlantic Region that would result in significant impacts to listed marine species." This kind of speculation and hypothesis cannot be equated with an unlikelihood of jeopardy, and is a clear signal that further scientific study and analysis is required.

Third, I find that the Final EIS itself contains an incomplete and conclusory discussion of the risk of jeopardy to endangered species. While taking the position that jeopardy is not likely, the Final EIS also states that "the combined effect of Sale 52-related oil spills could pose a moderate risk to peregrine falcon migratory stopover areas and osprey nesting areas," Final EIS at 240; "all sea turtles in the region may face a relatively high risk of contacting one or more [oil spill]," *id.;* and "all six of the endangered whale species occurring in the region may have a relatively high risk of contacting one or more [oil spill]," Final EIS at 243. Potential impacts on marine mammal species are described as "inconclusive and speculative," Final EIS at 242, and "uncertain," Final EIS at 246. At best, the data contained in the Final EIS indicates that the conclusion of no jeopardy may be unsupported; at worst, that conclusion may be simply wrong.

C. *The Coastal Zone Management Act*

◼ The plaintiffs have argued that the defendants' decision to proceed with Lease Sale 52 as planned is unlawful because the sale is not consistent "to the maximum extent practicable" with Massachusetts' federally-approved Coastal Zone Management Program, as required by the Coastal Zone Management Act. This Act was passed by Congress in order to promote comprehensive and coordinated planning for coastal zone development and preservation between states and the federal government. It contemplates a number of policy objectives, including

(1) to preserve, protect, develop, and where possible, to restore or enhance the resources of the Nation's coastal zone for this and succeeding generations; [and] (2) to encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone, giving full consideration to ecological, cultural, historic, and esthetic values as well as to needs for economic development.

16 U.S.C. §§ 1452(1) & (2). The Act also expressly recognizes "extraction of mineral resources and fossil fuels" and "harvesting of fish, shellfish, and other living marine resources." 16 U.S.C. § 1451(c), and "new and expanding demands for food [and] energy," 16 U.S.C. § 1451(f), as competing demands upon coastal zone lands and waters.

Under the Coastal Zone Management Act, each coastal state may adopt a coastal zone management program. Once the state program has been approved by the Secretary of Commerce, the Act requires:

Each Federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in manner which is, to the maximum extent practicable, consistent with approved state management programs.

16 U.S.C. § 1456(c)(1). The Massachusetts Coastal Zone Management Program was approved on April 24, 1978. 43 Fed.Reg. 25,169 (1978).

The Commonwealth of Massachusetts has argued that the proposed Lease Sale 52 is not consistent "to the maximum extent practicable" with its approved program. Specifically, the Commonwealth argues that the sale as planned is inconsistent with Policy 9 of the program, which provides as follows:

a. Accommodate exploration, development and production of offshore oil and gas resources while minimizing impacts on the marine environment, especially on fisheries, water quality and wildlife, and on the recreational values of the coast, and minimizing conflicts with other maritime-dependent uses of coastal waters or lands. Encourage maritime-dependent facilities serving supply, support or transfer functions to locate in existing developed ports.

b. Evaluate indigenous or alternative sources of energy (coal, wind, solar and tidal power) and offshore mining to minimize adverse impacts on the marine environment, especially with respect to fisheries, water quality, and wildlife, and on the recreational values of the coast.

◼ As a preliminary matter, I note that the defendants contest whether Lease Sale 52 is within the purview of the consistency provisions of the Coastal Zone Management Act at all. The defendants argue that the sale of leases for outer continental shelf oil and gas exploration does not "directly affect" the coastal zone, and cite as authority the recent decision of the District Court for the District of New Jersey, *Kean v. Watt*, No. 82–2420 (D.N.J.1982), *appeal docketed*, 82–5629 (3d Cir. November 10, 1982). There, the Court declined to extend the consistency provisions of the Coastal Zone Management Act to other than direct physical impacts upon the immediate coastal region:

In expressing concern as to a fishery more than 60 miles offshore, New Jersey does not allege any physical impact on its

coastal zone other than the possible effect (as yet not established) upon the summer flounder, black sea bass and scup. It would be in clear conflict with the Federal Government's exercise of its jurisdiction over the Outer Continental Shelf to extend the reach of the State's Coastal Zone Management Program to actions and effects felt exclusively in the Outer Continental Shelf area.

I respectfully disagree with the analysis of the District Court in New Jersey for a number of reasons. First, I believe the Coastal Zone Management Act, by its own terms, recognizes that a wide range of uses and concerns come within the purview of the Act. This is reflected in the above-quoted language of the Act, making reference to "ecological, cultural, historic and esthetic values *as well as ... economic development,*" 16 U.S.C. § 1452(2) (emphasis added), and identifying both food and energy resources as important coastal assets, 16 U.S.C. §§ 1451(c) & (f).

Second, the legislative history of the Act indicates that a broad definition of "direct effect" was intended by Congress. The House Report states:

This section establishes a national policy to protect, preserve, develop, and where possible, enhance the resources of the coastal zone ... includ[ing] natural, commercial, recreational, industrial, and esthetic resources.

H.Rep. No. 92–1049, 92d Cong.2d Sess. (1972) at 13. Review of the Senate Report further indicates that not only the ecological but also the social and economic effects of a proposed Federal agency action are included in the scope of the Act. Example after example of socioeconomic effects of oil and gas exploration were discussed, evidencing a clear Congressional intent to lessen such impacts through coordinated planning between states and the Federal government. Concern was expressed over the effects of concentrated industrial development in Louisiana's coastal zone; over housing and school shortages and employee losses in the agricultural and fishing industries indigenous to coastal Virginia; and

over disruptions in Native American communities in Alaska. Indeed, even the social and economic pressures felt in Scotland as a result were carefully analyzed by Congress in framing the 1976 amendments to the Coastal Zone Management Act. 1976 U.S. Code Cong. & Ad.News 1768, 1778–87; *see* Briefs of Amicus Curiae, States of California and New Jersey. Finally, the Ninth Circuit's decision in *California v. Watt, supra,* has recently held that a lease sale does directly affect the coastal zone. The Court adopted the statement of the District Court:

The purpose of the Act would not be furthered by excluding the states from the critical decision-making relating to oil and gas resources in the [outer continental shelf]. If the state is consulted only after the plans are drawn and the parameters for exploration and development are set, as a practical matter, it will be relegated to the defensive role of objecting to the proposals of individual lessees as they are presented. Thus, the comprehensive planning in accordance with the [state's] management plan cannot occur and there will be no opportunity for the orderly decision-making envisioned by the draftsmen of the CZMA.

*California v. Watt,* 520 F.Supp. 1359, 1371 (C.D.Cal.1981), *cited with approval in California v. Watt, supra,* 683 F.2d at 1260. In short, I find that proposed Lease Sale 52 "directly affects" the Massachusetts Coastal Zone and therefore is subject to the consistency requirements of the Coastal Zone Management Act.

Having determined that Lease Sale 52 will "directly affect" the Massachusetts coastal zone within the meaning of the Coastal Zone Management Program, the question is whether Secretary Watt has met his obligation to demonstrate that the sale is consistent "to the maximum extent practicable" with the Massachusetts Coastal Zone Management Plan.

The National Oceanic and Atmospheric Administration has promulgated regulations detailing the scope of this duty. Federal agencies are to provide a consistency

determination "at the earliest practicable time," following "development of sufficient information to determine reasonably the consistency of the activity with the State's management," but "before the Federal agency reaches a significant point of decision-making in its review process." 15 C.F.R. § 930.34(b). This information may be provided "in any manner [the agency] chooses so long as the requirements of this subpart are satisfied." 15 C.F.R. § 930.-34(a). The consistency determination must contain:

a detailed description of the activity, its associated facilities, and their coastal zone effects, and comprehensive data and information sufficient to support the Federal agency's consistency statements.

15 C.F.R. § 930.39(a). The proposed action is required "to be fully consistent with [approved state coastal zone management programs] unless compliance is prohibited based upon the requirements of existing law," and the "statutory provision, legislative history or other legal authority" preventing compliance must be specified. 15 C.F.R. § 930.32(a).

Here, Massachusetts made an initial determination in June of 1982 that Lease Sale 52 would be inconsistent with its Coastal Zone Management Plan unless some 103 tracts were deleted. The Secretary responded by preparing a consistency determination for proposed Lease Sale 52. On November 17, 1982, he advised the Commonwealth of Massachusetts that Lease Sale 52 was consistent to the maximum extent practicable with its coastal zone management program. Massachusetts requested clarification of this finding in a letter dated December 21, 1982, and formally notified the Department of Interior of its disagreement with the consistency determination on January 17, 1983. The Commonwealth stated that in order for the sale to be consistent with its program, and specifically with Policy 9, several changes would be required. These included the deletion of 98 tracts, the extension of the Biological Task Force study to the entire sale area, and the addition of supplemental language to a lease stipulation concerning transporta-

tion of hydrocarbons. The Secretary adopted certain of these recommendations and rejected others; specifically, he extended the scope of the Biological Task Force and added the requested language to the lease stipulations, but determined to delete only 41 of the 98 requested tracts from the sale.

It appears clear from this record that the significant, formal, procedural requirements of the Coastal Zone Management Act have been met. That is, the Secretary has provided the appropriate state agency, here the Coastal Zone Management Office, with a consistency determination as required under the terms of the Act. I do not find that the determination, received approximately five weeks prior to the publication of the Final Notice of Sale, was untimely. However, I am concerned that the substantive requirements of the Coastal Zone Management Act and regulations have not been satisfied.

■ It is plain from the language of the Act and regulations that the burden of establishing compliance with a state program is on the federal agency proposing the contemplated action, and not on the state. Though I reject the notion that Congress intended to give the states an absolute "veto power" over federal action in the coastal zone, I believe it is manifest from the fact of the statute that Congress did intend to cede some authority in matters of coastal development to the affected states in order to achieve cooperative and coordinated development of scarce natural resources. The requirement of consistency with federally-approved state coastal zone management programs is not one to be dismissed lightly; full consistency is called for, unless "compliance is prohibited based upon... statutory provision, legislative history, or other legal authority." 15 C.F.R. § 930.32(a).

■ The Secretary has considered the consistency of proposed Lease Sale 52 with Policy 9 of the Massachusetts Coastal Zone Management Program at pages 24 and 25 of his consistency determination. The purpose of Policy 9 is summarized as "accommodating [outer continental shelf] develop-

ment while minimizing possible adverse environmental effects and use conflicts." This is described as "similar to the goal of the [federal outer continental shelf] program, as set forth in the OCS Lands Act, to encourage development of outer continental shelf oil and gas in an environmentally safe manner." Therefore, since Lease Sale 52 is proposed under a statute designed to "prevent, eliminate or minimize harm to the coastal and marine environment and to prevent or minimize conflict with other uses of the [outer continental shelf]," the Secretary concluded that the proposed sale is "consistent to the maximum extent practicable with this MCZMP policy of accommodating [outer continental shelf] development while minimizing adverse effects."

The Secretary stated a number of factors in support of his conclusion that the sale was consistent to the maximum extent practicable with the Massachusetts Coastal Zone Management Program. Specifically, he indicated that the Commonwealth had at its disposal many opportunities for review and consultation during the outer continental shelf development process. These include licensing of pipelines and related facilities; local zoning regulation of developing support facilities; and on-going monitoring of leasing activity. Further, he indicated, the Commonwealth would be able to exercise the federal consistency provisions in the Coastal Zone Management Act as to future offshore and onshore development activities; and noted

> OCS exploration and development and production plans, Federal Energy Regulatory Commission pipeline permits, Corps of Engineers platform permits, EPA wastewater discharge permits, and MMS pipelines right-of-way permits

as specific examples of projects subject to the Coastal Zone Management Act review process. He concluded:

> Proposed Sale No. 52 is fully consistent with [Policy 9]. If a pipeline is laid and a gas processing plant built in Massachusetts, all applicable State and local permits and approvals, including an EFSC license, would have to be obtained in ad-

vance. This consistency determination, the EIS for the sale, and the official request for the Governor's comments on the proposed Notice of Sale under section 19 of the OCS Lands Act . . . all provide the Commonwealth with opportunities for 'monitoring and reviewing the OCS leasing . . . process.' OCS development and production plans are also subject to State review under section 19 of the OCS [Lands Act], and to a CZM consistency certification under section 307(c)(3) of the CZMA . . . The Commonwealth also has an opportunity to review the environmental assessment or EIS prepared on each development and production plan. *There is nothing in the terms or configuration of proposed Sale No. 52 that would affect CZM participation in the OCS leasing and development process. The proposed Sale No. 52 is therefore consistent to the maximum extent practicable with this MCZMP policy.*

(emphasis added).

In response to this finding of consistency, the Governor's Executive Office of Environmental Affairs stated:

> A policy expressed by the CZMA is to provide the proper balance between the competing goals of exploitation and conservation of the Nation's living and non-living resources. Policy 9 of the MCZMP is an enforceable, mandatory regulation promulgated by the Commonwealth which specifically addresses OCS oil and gas lease sales conducted by the Department of the Interior. Under Policy 9, Massachusetts has declared the policy of accommodating exploration, development and production of offshore oil and gas resources while minimizing impacts on the marine environment. Of particular concern to the State are the impacts on fisheries, water quality and wildlife, as well as on recreational and maritime-dependent uses of the coastal waters or land. Exploration, development and production activities are likely to flow from the lease sale, and therefore the anticipated effects of these activities have been measured against the specific elements of Policy 9 . . . which relate to the mini-

mization or avoidance of harm to traditional fishing grounds, fish resources and spawning areas, and wildlife and other marine resources... [T]he terms of the [proposed Notice of Sale] for Sale No. 52 fail to minimize impacts on the marine environment and fail to minimize conflicts with maritime-dependent uses as required by Policy 9.

In reference to the proposed deletion of 50 deep water tracts, the Commonwealth found:

[T]he proposed drilling in water depth greater than 2,000 meters would pose unacceptably high risks to fishery resources in the area and further inshore. The lack of proven, safe technology and the strength of the ocean currents mean that the safety of the operations cannot be adequately guaranteed. By failing to delete the deep water tracts from Lease Sale 52, the Department of the Interior has therefore failed to ensure minimization of risks to the marine environment, as required by Policy 9.

On close examination, it appears that the Secretary has based his finding of consistency on the coincidence of shared opposition to environmental damage and common interest in resource development, and on the availability of future opportunities for the Commonwealth to participate in the monitor and review process, through the required Coastal Zone Management Act consistency determinations and through other administrative devices. It may well be that the proposed action is consistent "to the maximum extent practicable" with Policy 9 and the Massachusetts Coastal Zone Management Program. It may further be that the Secretary can base this conclusion, as he is required to, upon "statutory provision, legislative history, or other legal authority." 15 C.F.R. § 930.32(a). However, even at this early stage in the procedure, I find that it is simply insufficient for the Secretary to base a finding of consistency on similar aims and goals between the state and federal regulatory schemes and the admittedly significant amount of state participation to come in the future. If that participation is to be meaningful overall, it must be considered at every stage, including this one. Therefore, I find that the Secretary has failed to articulate a proper basis for his finding that the proposed Lease Sale is consistent with the Massachusetts Coastal Zone Management Program, and I conclude that he has failed to discharge his obligations under the Coastal Zone Management Act.

### D. The Outer Continental Shelf Lands Act

 The plaintiffs have argued that the conduct of the defendants in preparing for Lease Sale 52 violates the procedural and substantive requirements established by the Outer Continental Shelf Lands Act. This Act, comprehensively revised by the Outer Continental Shelf Lands Act Amendments of 1978, has among its purposes to provide states with "a leading role in OCS decisions and particularly as to potential lease sales." H.Rep. No. 95–590 at 152 (1978), quoted in 1978 U.S.Code Cong. & Admin.News 1450, at 1559. This purpose is achieved by section 19 of the Act, 43 U.S.C. § 1345, which provides opportunity for the Governor of a state to be affected by a proposed outer continental shelf lease sale to submit conditionally binding recommendations as to the size, timing and location of the proposed sale. 43 U.S.C. § 1345(a). As the Secretary noted in his correspondence with Governor Dukakis on March 11, 1983,

In deciding whether to offer a set of tracts for lease, according to the OCSLA, we must accept the recommendations of the Governor on the size, timing or location of a proposed sale if the recommendations 'provide for a reasonable balance between the national interest and the well-being of the citizens of the affected state.'

See 43 U.S.C. § 1346(c). The Secretary's decision whether to accept or reject the Governor's recommendations must be communicated to the Governor in writing. 43 U.S.C. § 1345(c). His determination constitutes final agency action and may be overturned on judicial review only if it is arbitrary or capricious. 43 U.S.C. § 1345(d).

The OCS Lands Act provides some guidance to the Secretary and the courts as to how the Governor's recommendations must be considered. The Secretary "shall accept" his recommendations if they provide "a reasonable balance between the national interest and the well-being of the citizens of the affected state." 43 U.S.C. § 1345(c). The need to consider competing factors in determining whether the governor's recommendations are "a reasonable balance" is emphasized throughout the statute. Oil and gas resources are to be "developed in a manner which takes into consideration the Nation's long-range energy needs and also assures adequate protection of the renewable resources of the OCS which are a continuing and increasingly important source of food and protein to the Nation and to the World," 43 U.S.C. § 1801(14); and the Secretary is required "to balance orderly energy resource development with protection of the human, marine, and coastal environments," 43 U.S.C. § 1802(2)(B).

 In his comments on proposed Lease Sale 52, the Governor made recommendations substantially identical to those offered by the Executive Office of Environmental Affairs under the Coastal Zone Management Act. These included a number of proposed tract deletions, a proposed lease stipulation and the extension of the scope of the Biological Task Force study to the entire sale area. As I have noted above, these latter two recommendations were adopted. As to the proposed tract deletions, 46 of the proposed 98 tracts were included in the Final Notice of Sale.

The Secretary responded to the Governor's recommendations in a letter dated March 11, 1983—the day the motions for preliminary injunction were filed. The Secretary acknowledged the conditionally binding nature of the Governor's recommendations under section 19 of the OCS Lands Act, and discussed at some length his reasons for accepting and rejecting each of the Governor's proposals. The Secretary attempts, in his discussion, to state his conclusions as the product of a balancing process between the competing considerations of energy exploration, fishery maintenance and environmental protection identified in the OCS Lands Act. *See* 43 U.S.C. § 1801(14); 43 U.S.C. § 1802(2)(B). However, it is apparent that the careful balancing called for under the terms of the Act, in determining to accept or reject presumptively binding recommendations of the Governor, did not in fact take place. Rather, the presence or absence of "oil and gas-bearing geologic structures" on each of the tracts nominated for deletion served to effectively and absolutely determine whether that tract would be included in the proposed sale.

The Secretary states "the decision to delete the seven tracts within the 60-meter isobath was made on the basis of the apparent absence of oil- and gas-bearing geologic structures on those tracts." As to the canyon head tracts proposed for deferral, all but one were deferred "on the basis of the apparent absence of oil- or gas-bearing geologic structures on these tracts," and "the one canyon head tract identified by Massachusetts which is included in the sale is estimated to contain an oil- or gas-bearing geologic structure." The deep water tracts proposed for deletion were "those which MMS believes are the most likely to contain hydrocarbon deposits." The Secretary's own analysis of the recommendations made by the Governor of Massachusetts indicates that in determining whether these recommendations represent "a reasonable balance between the national interest and the well-being of the citizens of the affected state," he failed to consider and balance the full range of factors described in the OCS Lands Act, factors that affect not only his assessment of the impact of the proposed sale on the citizens of Massachusetts but also on the nation as a whole. Accordingly, I find that his analysis and determination to all the Governor's recommendations were arbitrary and capricious and therefore in violation of the standards set forth in the OCS Lands Act.

 To summarize, I find that the plaintiffs have exhibited a likelihood of success on the merits of their claims raised

under the National Environmental Policy Act, the Endangered Species Act, the Coastal Zone Management Act and the Outer Continental Shelf Lands Act. They have also raised claims that the Secretary has failed to meet his common law duty of care to serve as guardian and trustee of the public lands, and that Secretary of Commerce Malcolm Baldridge has failed to meet his obligation under the Coastal Zone Management Act to mediate between state and federal agencies in the consistency determination process. At this preliminary stage, I am constrained to express no opinion as to the plaintiffs' likelihood of success on the merits of these two claims, as I believe the major substantive issues they raise are adequately addressed by the balance of the plaintiffs' complaint.

I further note that the plaintiffs filed on March 24, 1983 an amended complaint, allowed by the Court at hearing on March 26, 1983, joining the Gloucester Fisheries Association as a plaintiff and joining John W. Hernandez, in his capacity as Acting Administrator of the Environmental Protection Agency, as a defendant. Hernandez, it is alleged, failed to consider and forward to Secretary Watt comments on the Draft EIS prepared by Region I of the Environmental Protection Agency, as is his obligation under the National Environmental Policy Act and regulations. These comments, submitted to the Court by the plaintiffs during our hearing on March 26, 1983 as part of plaintiffs' Exhibit 1, are sharply critical of the Draft EIS. They state, in part:

> The alternatives section presents a good deal of support for not offering the lease sale as proposed, but instead offering an alternative sale, which would include a smaller number of blocks in environmentally sensitive area.

Comments on Lease Sale # 52, dated November 10, 1981, from Wallace E. Stickney, Director, Environmental Impact Office, Region I to Paul C. Cahill, Director, Office of Federal Activities, p. 2. The comments conclude:

> The Draft EIS provides a very uneven discussion of impacts from Lease Sale

# 52. While some sections are very thorough, others are misleading or incomplete. The Draft EIS presents little justification for not choosing alternative 5 or 6 over the proposed action. We therefore recommend that the Draft be rated as [Environmental Reservations—Insufficient Information.].

*Id.* at p. 4. Comments on the Final EIS were substantially similar, and further indicated the regional coordinator's concern that "EPA headquarters did not comment to Interior on the Draft EIS for Sale # 52," and that "the recent letter which did go to Interior expressing EPA's views on the proposed lease sale schedule did not reflect the comments the Region sent to Headquarters." Comments on Lease Sale # 52 Final EIS dated June 2, 1982 from Lester A. Sutton, Regional Administrator, to Paul Cahill, Director, Office of Federal Activities, p. 2. I recognize that the defendants have not had time to fully consider or respond to these statements and allegations, even in a preliminary fashion; and yet, even the plaintiffs' cursory presentation of this new claim is sufficient to raise a strong question in my mind as to whether the responsible officials performed their analysis in a result-oriented fashion and therefore did not appropriately discharge their duties under the National Environmental Policy Act to provide a fair, impartial evaluation of the most reliable data available to them. However, as I have stated, that question must await a trial on the merits. I simply acknowledge that on this record, admittedly an incomplete one, the plaintiffs' allegations do not appear to be entirely unfounded.

I now turn to the three other criteria that I must consider in determining whether to grant the requested preliminary injunction. These are whether the plaintiffs will suffer irreparable injury if the injunction is not granted, whether such injury outweighs any harm which granting injunctive relief would inflict on the defendants, and whether the public interest will be adversely affected by granting injunctive relief. *Planned Parenthood League v. Bellotti, supra; Auburn News Co., Inc. v. Providence Journal Co., supra.*

## II.

## IRREPARABLE HARM

The plaintiffs have argued that if proposed Lease Sale 52 is permitted to proceed as scheduled, despite the defendants' violations of the National Environmental Policy Act, the Endangered Species Act, the Coastal Zone Management Act and the Outer Continental Shelf Lands Act, they will be irreparably harmed because the Secretary will have proceeded in disregard of the significant procedural requirements and substantive duties established by the Congress to guide the decision-making process. The defendants have argued vigorously that no irreparable harm can occur at this early stage in the process of offshore oil exploration and development, because "the lease sale results in no physical intrusion on the environment, nor does it deprive the parties of remedies." It is true that the parties will continue to have access to the administrative and judicial process in order to press their claims, but such future access cannot effectively remedy violations of statutes and regulations that impose duties upon the Secretary *specifically with respect to* the decision to conduct Lease Sale 52. Correction of those violations, if it is to have any meaning at all, must precede the sale. The significance of pre-leasing activities was discussed at length by the District Court and affirmed by the Ninth Circuit in *California v. Watt:*

> Pre-leasing activities, including the call for nominations, the publication and circulation of an environmental impact statement, and the publication of a final notice of lease sale, define and establish the basic parameters for subsequent development and production. During the pre-leasing stage, which culminates in the final notice of lease sale, critical decisions are made as to the size and location of tracts, the timing of the sale, and the stipulations to which the leases are subject. *Each of these are key Outer Continental Shelf planning decisions.* The selection of tracts to be let determines where the lessee can explore and produce oil and gas. The decision to offer or

delete various tracts also determines which estuaries, reefs, wetlands, beaches, or barrier islands are exposed to the risk of oil spills and which are not. The particular stipulations imposed on the lessors, along with the designated location of the tracts, influence the flow of vessel traffic, the placement of platforms and drilling structures, as well as the siting of on-shore construction. Stipulations included in the lease determine what equipment is to be used and what training is to be provided by lessees working on the tracts. In addition, decisions made during the pre-lease stage establish the timing of [outer continental shelf] development and production. Thus, *the leasing sets in motion the entire chain of events which culminates in oil and gas development.*

*California v. Watt,* 520 F.Supp. 1359, 1371 (C.D.Cal.1981) (footnotes omitted, emphasis added), *cited with approval in California v. Watt, supra,* 683 F.2d at 1260. It is apparent that the failure of the Secretary to comply with the important procedural and substantive requirements established by Congress at this "key" stage in outer continental shelf development results in subjecting the plaintiffs to irreparable harm.

My finding of irreparable harm is further reinforced by the magnitude of the natural resource that is placed at risk by the proposed sale. The Georges Bank region has been ranked as the most productive fishery area in the world per unit area, twice as productive as the North Sea, four times as productive as the Grand Banks, and five times as productive as the Northeast Arctic. *See* Final EIS for Lease Sale 42, pp. 108–14. According to Governor King,

> The Fishery on Georges Bank supplies markets nationwide with fresh fish, scallops, and lobster. In 1981 the United States catch on Georges Bank totalled 361 million pounds, with an ex-vessel value of $158 million. While volume and value fluctuate, U.S. harvest over the last 10 years has been approximately 350–360 million pounds yearly. Applying a fisheries economic multiplier of 4.24 (Council of

State Governments, 1979) the harvest from Georges Bank fishery outweighs by three times the potential economic value of the oil and gas resources and the national security benefits of extracting these resources from the proposed sale area.

Letter from Governor Edward King to Secretary James Watt dated January 3, 1983. The Georges Bank fishery sustains a New England fishing industry worth one billion dollars a year and supports 40,000 jobs in the region. Brief of Conservation Law Foundation, at 4. In short, it represents a renewable, self-sustaining resource for the entire nation. To summarize, because I find that the plaintiffs have demonstrated that important safeguards directed at the decision-making process leading up to the consummation of proposed Lease Sale 52 have not been complied with; and in light of the significance of the Georges Bank fishery resource that may be jeopardized by that sale, I find that the plaintiffs have adequately demonstrated that they will suffer irreparable harm if this injunction does not issue.

### III.

### BALANCE OF EQUITIES

In order to prevail on their motions for a preliminary injunction, the plaintiffs must demonstrate that the injury they would suffer if the injunction is not granted is not outweighed by the harm that granting injunctive relief would inflict on the defendants. In this matter, I find that the balance of equities favors the plaintiffs. On the basis of what I found above, and will not repeat here, the plaintiffs have persuaded me that they are likely to succeed on a number of their claims that the defendants have conducted this sale in a manner that is arbitrary, capricious, and otherwise not in accordance with law. The plaintiffs further have persuaded me that they will be irreparably injured if the sale is allowed to proceed. Against this injury, the defendants will suffer only the harm of some further delay, in order that they may properly and fully discharge their obligations under the several statutes that govern their actions. Whatever delay is occasioned between the time this injunction issues and a full trial on the merits is relatively slight in the context of an oil and gas exploration program scheduled to take place over the next twenty to thirty years. The resources, if they are there, will remain intact. The technology, both as to resource extraction and as to environmental preservation, can only improve. Therefore, I find that the balance of the harm to be suffered by the plaintiffs if the injunction does not issue against the harm to be suffered by the defendants if it does clearly tips in favor of the plaintiffs.

### IV.

### THE PUBLIC INTEREST

Finally, I must consider whether the public interest will be harmed by the issuance of an injunction. Both plaintiffs and defendants seek to identify their positions in this litigation with the public interest, and argue persuasively that the actions they have taken, either in promoting or opposing proposed Lease Sale 52, are not only not against the public interest, but in active pursuit of the public interest. The Commonwealth is supported in its argument by the Conservation Law Foundation and a number of fishery and environmental organizations as co-plaintiffs. The federal defendants are joined in their claims by the oil industry, as intervenor co-defendants, and the New England Council as *amicus curiae.* After weighing the parties' respective claims to the public interest, I find the public interest is not harmed by granting the requested injunctive relief.

Certainly, the Commonwealth of Massachusetts and the Conservation Law Foundation are not unalterably opposed to *any* oil and gas development, at *any* time, under *any* circumstances. Neither are the federal government and the oil industry seeking to sacrifice an important renewable natural resource that, in the words of Judge Garrity, "has taken millions of years to accrue, and which will be with us for better or

worse for untold centuries to come." *Massachusetts v. Andrus,* 594 F.2d 872, 881 (1st Cir.1979), *quoting Massachusetts v. Andrus,* slip opinion at 25 (D.Mass. January 28, 1978). I acknowledge that the public interest is well served both by preservation of known, renewable fishery resources and by exploration for unknown, nonrenewable oil and gas resources. However, I believe that at this stage in the exploration and development of Georges Bank, the public interest is best served by enjoining the proposed sale until such time as it may proceed in accordance with the law.

It is plain that the public interest calls upon the courts to require strict compliance with environmental statutes. *National Wildlife Federation v. Andrus,* 440 F.Supp. 1245, 1256 (D.D.C.1977). Congress has mandated that action to proceed with outer continental shelf oil and gas development must be taken in accordance with several regulatory schemes, that require public disclosure of and comment on all factors relevant to a balanced, reasoned, and informed decision, special consideration as to the preservation of endangered species, and compliance with coastal zone management programs and governor's recommendations from the affected states. The plaintiffs have demonstrated a likelihood of success on the merits of their claims that this mandate has not been satisfied. The public interest clearly requires that the Congressional mandate be fulfilled.

The public interest also requires me to carefully consider the relative significance of the resources at issue. The amount of oil to be found on Georges Bank, if there is any at all, represents an insignificant contribution to overall United States consumption. A brief delay will have no effect of any substance on the ultimate exploitation of that resource. By contrast, the fishery located on the Georges Bank region is of known value and great significance, both to the region and the nation, as a source of food and a mainstay of local industry. Weighing the interest of the public in the development and preservation of those two important resources, I must conclude that proceeding hastily with oil exploration in this region presents an unnecessary risk of harm of potentially indefinite duration, for an unacceptably small benefit.

### CONCLUSION

For the reasons stated above, I find that the plaintiffs have demonstrated a likelihood of success on the merits of their claims, that they will suffer irreparable harm if the injunction is not granted, that such harm outweighs any injury which granting injunctive relief would inflict on the defendants, and that the public interest will not be adversely affected by granting the requested injunctive relief. Therefore, the motions for preliminary injunction should be and hereby are GRANTED.

SO ORDERED.