COMMONWEALTH OF
MASSACHUSETTS,
Plaintiff,

v.

William P. CLARK, Secretary of the Interior, and the United States Department of the Interior, Defendants.

CONSERVATION LAW FOUNDATION OF NEW ENGLAND, INC., Gloucester Fishermen's Wives Association, Massachusetts Inshore Draggerman's Association, Natural Resources Defense Council, Nantucket Land Council, Greenpeace New England, Massachusetts Audubon Society, Massachusetts Association of Conservation Commissions, Sierra Club, Plaintiffs,

v.

William P. CLARK, as he is Secretary of the United States Department of the Interior, Malcolm T. Baldridge, as he is Secretary of the United States Department of Commerce, Defendants.

Civ. A. Nos. 84–2757–MA, 84–2766–MA.

United States District Court,
D. Massachusetts.

Sept. 26, 1984.

**1374**

Douglas I. Foy, Armond M. Cohen, R. Alan Fryer, Conservation Law Foundation of New England, Inc., Boston, Mass., for plaintiffs in No. 84–2766–MA.

William Cohen, U.S. Dept. of Justice, Washington, D.C., Ralph A. Child, Asst. U.S. Atty., Deputy Chief, Civ. Div., Boston, Mass., for defendants in Nos. 84–2757–MA, 84–2766–MA.

E. Edward Bruce, John Thomas Smith, II, Covington & Burling, Washington, D.C., Robert R. Ruddock, N.E. Legal Foundation, George Marshall Moriarty, John D. Donovan, Jr., Ropes & Gray, Boston, Mass., for intervenor-defendants in No. 84–2766–MA.

Stephen M. Leonard, Lee Breckenridge, Dept. of the Atty. Gen.; EPD, Boston, Mass., for plaintiff in No. 84–2757–MA.

George Marshall Moriarty, Ropes & Gray, Boston, Mass., for intervenor-defendants in No. 84–2757–MA.

Robert R. Ruddock, N.E. Legal Foundation, Boston, Mass., amicus curiae in No. 84–2757–MA.

MEMORANDUM AND ORDER

MAZZONE, District Judge.

Once again, this Court is involved with the efforts of the Commonwealth of Massachusetts (the Commonwealth), and the Conservation Law Foundation and associated environmental groups (CLF) to enjoin the Secretary of the Interior and the Secretary of Commerce (the Secretary) from leasing sections of the outer continental shelf located off the coast of Massachusetts. On August 27, 1984, the Secretary published a Final Notice of Sale for Lease Sale 82 (Sale 82). The sale is scheduled for Wednesday, September 26, 1984 with bids to be received on September 25, 1984, and involves 1,138 of the 4,366 tracts originally included in Sale 82. Both the Commonwealth and the CLF filed suit in this Court seeking an injunction of the proposed sale. A hearing on their motions for a preliminary injunction was held on September 20, 1984. Jurisdiction is proper pursuant to 43 U.S.C. § 1349.

I.

The history of this case is both long and familiar to this Court. Many of the essential facts may be found in this Court's earlier opinion in *Conservation Law Foundation v. Watt* at 560 F.Supp. 561 (D.Mass. 1983) (hereinafter *CLF v. Watt*), and the First Circuit decision affirming that opinion, *Commonwealth of Massachusetts, et al. v. Watt*, 716 F.2d 946 (1st Cir.1983), and need not be repeated. The following chronology and additional facts are relevant to this sale.

On November 23, 1982, while the Department of the Interior (DOI) was attempting to conduct Lease Sale 52, the subject of the litigation noted above, the Secretary published a call for information in the Federal Register relating to a proposed lease sale in the section of the Atlantic Ocean located off the coast of Massachusetts. This sale, proposed Sale 82, covered approximately 25

million acres of ocean bed, including the entire Georges Bank area, the most productive fishing area on the eastern coast of the United States, and one of the most fertile fishing areas in the world. Sale 52 consisted of a small portion of the massive area covered by Sale 82. The original Sale 82 proposal consisted of 4,366 tracts, or blocks, located from 19 to 256 miles off the shore of Cape Cod and Nantucket Island. The tracts lie under water ranging from 16 to 3,000 meters deep. Each tract contains approximately 5,693 acres. On March 28, 1983, this Court enjoined Sale 52, partially on the ground that the final Environmental Impact Statement (EIS) prepared in connection with that sale was inadequate. In June of 1983, a draft of the EIS for Sale 82 was prepared and circulated.

On October 20, 1983, the United States Congress passed a moratorium (the Moratorium) on the leasing of certain ocean beds in the Atlantic, largely in response to the efforts of parties concerned about proposed exploration in the Georges Bank area. The ocean beds affected by the Moratorium encompass all land inside the 60 meter isobath near Georges Bank (i.e., all lands in less than 60 meters of water) and lands within a specified distance of Georges Bank's many submarine canyons. These canyons are particularly important to the support and breeding of a variety of sea life, including the lobster, squid, tilefish, shrimp, and coral because of the unique current and tidal movement of water around the canyons. Since the Moratorium is tied to the expenditure of government funds in fiscal 1984, it will expire at the end of fiscal 1984, unless extended by Congress, leaving these important tracts presumably available for leasing by the DOI. Approximately, 1,378 full and 125 partial blocks relevant to this case are affected by this Moratorium. Admin.R. 142 at 1.

Since the Moratorium will still be in effect as of the proposed September 1984 sale date, large portions of the area originally included in Sale 82 cannot be legally offered in September. Further, due to a dispute between the United States and Canada regarding the location of the international boundary line between United States and Canadian waters, the State Department has requested that approximately 1,987 tracts of the original Sale 82 area be "deferred." Because of these two problems, the Secretary decided to split Sale 82 into two parts, offering only some of the remaining tracts in September 1984 as "Part I." All areas subject either to the Moratorium or the boundary dispute were deferred (not, I note, "deleted") until "Part II" of Sale 82, which, presumably, will occur after the expiration of the Moratorium, September 30, 1984, and after the International Court of Justice resolves the pending boundary dispute, which is expected to occur in 1984.

On November 21, 1983, the DOI cancelled Sale 52, and the very next day issued the Final EIS (FEIS) for Sale 82, which, as noted above, completely subsumed the area covered by Sale 52. A Secretarial Issue Document (SID) was prepared and apparently sent to the Secretary, if not published, on November 22, 1983. In early May, 1984, the Secretary notified Governor Dukakis of Massachusetts of his intent to conduct Sale 82 and, pursuant to Section 19 of the Outer Continental Shelf Lands Act (OCSLA), requested his comments. The proposed notice of sale was published in the Federal Register on May 14, 1984. Governor Dukakis formally responded to the Secretary on July 3, 1984, reiterating his concern, raised prior to the publication of the proposed notice (Admin.R. 154 at 4), that the particular sensitivity of the areas inside the 400 meter isobath required deletion of all tracts falling within that area. On August 22, 1984, the DOI sent a formal response to Governor Dukakis' letter, rejecting his assessment of the proper balance of federal and local interests, and stating: "(b)ecause of Massachusetts' concern ... only 149 blocks in water depths of 400 meters or less that have been identified as high priority to industry are included in the Notice of Sale for Part I." (Admin.R. 198 at 2). On Friday, August 24, 1984, an Environmental Assessment document (a document that assesses information gathered since the preparation of the FEIS) and a finding of no significant impact were

published in the Federal Register. The following Monday, August 27, 1984, a final notice of sale was published, setting the sale date for thirty days later, the minimum time period allowed by 43 U.S.C. § 1337(*l*).

The significance of the Georges Bank fishery to Massachusetts, the New England states, and the nation was discussed extensively in my decision on Sale 52. More recent figures show the 1983 United States' catch on Georges Bank to total 295 million pounds, with an ex-vessel value of $132 million. Applying a fisheries economic multiplier of 2.7 to 7 (FEIS at 213) the New England catch generated between $960,795,000 and $2,490,950,000 of economic activity in 1983. FEIS at 213. Approximately 89% of the catch from Georges Bank is caught by Massachusetts fishermen, but the harvest is sold throughout the nation. Admin.R. 176 at 2. More recently, there has been great concern by many parties that the catch seems to be dwindling. Specifically, the lobster population has been threatened, raising ever greater concerns about the integrity of the Georges Bank ecosystem.

The history of the oil and gas exploration efforts in the area were also discussed in my prior decision, but it must be noted that since 1980, the only eight exploratory wells ever drilled in the area have been capped and abandoned as "dry holes." No discoveries of oil or natural gas have been made in the region. It was largely as a result of a radical decrease in oil resource estimates that the First Circuit upheld the injunction of Sale 52, because without an EIS that accurately presented the *benefits* as well as the risks of oil exploration, the Secretary could not adequately assess the wisdom of approving a particular sale. The value of the gas and oil resources in the scheduled Sale 82 area are estimated by the Minerals Management Service (MMS) of the DOI to be as follows: the "conditional mean resource estimates" for the area

remaining after the Moratorium acreage has been eliminated are 140 million barrels of oil and 3.1 trillion cubic feet of gas. SID at 7. The FEIS estimates that there is a 74% probability that no oil in commercially recoverable amounts will ever be found. FEIS at 288. Since no alternative presented in the FEIS was identical to the actual acreage presented in Sale 82, MMS prepared an environmental assessment document (EA) in August, 1984, to better inform the Secretary of the risks and benefits available to him. The EA considers two alternative actions: (1) a lease of the original offering less the lands covered by the Moratorium (which corresponds to Alternative 10 in the FEIS), and less 327 tracts "identified by industry as having low or no interest and which also had resource or use conflicts," and 151 tracts deleted at the request of the Department of Defense as containing submarine transit lanes; and (2) a lease from which all tracts in waters shallower than 400 meters are deleted (i.e., the action requested by Governor Dukakis). As noted above, this EA and the related finding of no significant impact were published in the Federal Register on Friday, August 24, 1984, three days before the final notice of sale was published on Monday, August 27, 1984.

## II.

Before beginning a discussion of the merits of the parties' various positions, it should be noted that this complaint was filed only 21 days before the date of the anticipated sale. In that time, the parties have submitted a voluminous record and the parties have been heard at oral argument.[1] As was true in the Sale 52 litigation, the subject of oil and gas exploration in the Georges Bank area has been treated exhaustively. I note now, as I did then, that my task is not to evaluate the wisdom of the Secretary's decision to proceed with the sale of leases in this region. Rather, I

---

1. The Secretary followed the same practice here as in Lease Sale 52, that is, issuing a final notice of sale setting the date at the 30 day minimum time allowed, and then depositing a voluminous record with the Court. The justification offered

was adherence to the proposed 5-year leasing program of DOI. This slavish devotion to a *proposed* plan by the defendants is incomprehensible given the volume of the record and complexity of the issues involved.

am to analyze carefully, under the Administrative Procedure Act, 5 U.S.C. § 706, whether the agency action involved is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... [or] without observance of procedures required by law. 5 U.S.C. §§ 706(2)(A) & (D). As the First Circuit noted in *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646 (1st Cir.1974), this is more than a duty to cursorily scan the record and pleadings before the court and rubber-stamp the technical findings of the administrative agency:

> [T]he Agency's technical conclusions no less than others ... [must be] founded on supportable data and methodology, and meet minimal standards of rationality.... While reviewing courts are not to substitute their judgment for an agency's, they are to establish parameters of rationality within which the agency must operate. A court would abdicate its function were it, when confronted with important and seemingly plausible objections going to the heart of a key technical determination, to presume that the agency could never behave irrationally. It has a duty to see that objections are faced in a proper procedural setting and satisfactory answers provided demonstrating careful agency considerations.

*Id.* at 655 and 665. I am further guided by that court's decision in the prior litigation in this case, found in *Commonwealth v. Watt,* 716 F.2d 946 (1st Cir.1983).

The parties have raised numerous arguments both for and against the validity of this sale. The plaintiffs' claim that the Secretary has violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* (NEPA), the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.* (ESA), and the Outer Continental Shelf Lands Act (OCS-LA), 43 U.S.C. §§ 1331 *et seq.* For the reasons indicated below, I find that the proposed sale violates both NEPA and OCSLA. Because these two grounds are sufficient to support the granting of a preliminary injunction, I do not reach the claim that the sale would violate the ESA.

To succeed on their motions for a preliminary injunction, the plaintiffs must prove four propositions: (1) they are likely to succeed on the merits; (2) failure to issue an injunction will result in irreparable harm to them; (3) such injury outweighs any harm that granting injunctive relief will impose on the defendants; and (4) the public interest will not be adversely affected by the granting of the injunction. *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). The parties have focused primarily on the first of these propositions. Because I believe the issue of the likelihood of success on the merits to be central to this case, I begin my analysis there. *CLF v. Watt,* 560 F.Supp. at 568.

III.

*Plaintiffs' Claim that Sale 82 Violates NEPA*

After reading plaintiffs' briefs and listening to counsel at oral argument, it is clear that they are raising two distinct but related failings of the FEIS. First, both plaintiffs argue that the FEIS failed to present adequate alternatives to the Secretary and that therefore he had insufficient information to make an informed decision regarding whether, and how, to proceed with leasing in the area. They claim that neither the SID nor the EA can cure the failings of the FEIS. Secondly, CLF claims that the FEIS simply cannot constitute a legally adequate document because it tries to cover too wide an area. There is no possible way, CLF claims, that an EIS can effectively indicate the risks and benefits of a drilling program that extends over a 25 million acre region. Because I believe that both of these claims have merit, I discuss them in order below.

NEPA is explicit as to the requirements placed on the Secretary. Under this Act, the DOI, prior to auctioning any leases, must prepare a statement that describes "the environmental impact of the proposed action, ... any adverse environmental effect which cannot be avoided ..., [and] alternatives to the proposed action...." 42 U.S.C. § 4332(C). In *Commonwealth v. Watt,* the First Circuit upheld an injunction

issued by this Court on the ground that a 97% reduction of the likelihood of finding oil required the preparation of a new or supplemental EIS. I find the Sale 82 as actually scheduled is sufficiently different from the alternatives discussed in the FEIS to require a supplemental EIS.

■ In the present case, the DOI prepared a FEIS that proposed a maximum offering of 4,366 tracts (approximately 25 million acres). Ninety-one pages of the FEIS were devoted to that size offering. (FEIS at i). The FEIS lists what appears to be an extensive array of alternatives. The maximum number of pages devoted to any of these alternatives is 24, and most of them receive only 3 or 4 pages of discussion. The 24-page discussion relates to Alternative 10, which is closest in effect to the actual scheduled sale. These alternatives, fail to satisfy the teaching of the Circuit Court's *Commonwealth v. Watt* decision. The test is whether the FEIS "describ[es] the likely environmental harms well enough to allow the Secretary to make an informed decision." *Id.*, 716 F.2d at 948. At the time the Secretary filed his Final Notice of Sale on Friday, August 24, 1984, he presumably had the following sources of information available to him: The FEIS (published November 22, 1983); the SID (published the same date); and the EA, dated August 21, 1984, although not published until August 24. While it is possible to question whether the Secretary thoroughly evaluated the information contained in an EA furnished to him at best only three days before publishing his decision to go through with the sale, I need not answer this question now. I believe that even assuming he had access to the EA and made proper use of it, that document did not and could not constitute an adequate supplement to the FEIS.

Although the choices facing the Secretary are best understood in visual terms, I set out the alternatives below.

*Alternatives presented by the FEIS*

1. Auction the entire 4,366 acre area, including the acreage affected by the Moratorium. [The FEIS notes that although this alternative is temporarily illegal, it should be considered because "full public scrutiny" is desirable.] All other proposals are based on this alternative as a "starting ground."

2. Delay the lease offering.

3. Cancel the lease offering.

4. Delete all blocks within 50 miles of shore (a decrease of 6% of the area offered under alternative 1).

5. Delete 106 blocks in the canyon area.

5-1. Delete 224 blocks in the canyon area.

6. Delete all blocks within the 60 meter isobath (i.e., delete 663 blocks from the total offering).

6-1. Delete blocks in central and northeast Georges Bank (i.e., delete 985 blocks within the 60 meter isobath and the northeast peak region).

7. Delete 404 blocks in the Great South Channel.

7-1. Delete 472 blocks in the Great South Channel.

8. Delete 251 blocks in the Traffic Separation Scheme and Precautionary area.

9. Delete 770 blocks in the shelf break zone.

10. Delete 1,542 blocks (i.e., auction everything except the lands subject to the Moratorium).

*Alternatives presented by the SID*

A-1. This is the same as Alternative 1 of the EIS.

A-2. This is the same as Alternative 10 of the EIS.

A-3. This is the same as Alternative 5 of the EIS.

A-4-a. This is the same as Alternative 6 of the EIS.

A-4-b. This is the same as Alternative 6-1 of the EIS.

A-5. This is the same as Alternative 9 of the EIS.

A-6. Defer the offering of blocks in the submarine transit lanes. (This 291 block deletion was requested by the Department of Defense).

A-7. Defer offering blocks in the Area disputed with Canada.

A–8. This is the same as Alternative 2 of the EIS.

A–9. This is the same as Alternative 3 of the EIS.

*Alternatives presented by the EA*

1. Conduct the sale as described in the Proposed Notice of Sale, i.e., sell all areas not covered by the Moratorium, except for 327 blocks "identified by industry as having low or no interest and which also had resource of use conflicts," and 151 blocks deleted at the request of the Department of Defense containing submarine transit lines.

2. Delete all blocks within the 400 meter isobath.

Although this may appear to be an extensive list of alternatives from which the Secretary could choose, all the alternatives take as their starting point an assumption that the entire 25 million acre area is available for and likely to be leased. This is reminiscent of the Sale 52 FEIS, of which the First Circuit noted, "our reading of the FEIS shows us that it was written with the 1.73 billion barrel mean in mind, and suggests that an FEIS written with a 56 million barrel mean expectation would be a very different document." *Commonwealth v. Watt*, 716 F.2d at 948. In the present case, an FEIS written with deletions of either the tracts subject to the Moratorium or the boundary dispute might also have been a very different document.

A. *The FEIS failed to describe any alternatives that the Secretary could have selected for a September, 1984 Sale date.*

The FEIS presents 13 alternatives from which the Secretary could choose. It describes the risks and benefits associated with each of those alternatives. I note that only two "alternatives" receive more than four pages of discussion in the approximately 700 page document. These are Al-

ternative 1 (hold the lease offering as proposed—all 25,000,000 acres), and Alternative 10 (delete those blocks falling within the area subject to the Moratorium). Two of the alternatives are (1) a proposal to delay the offering, and (2) a proposal to cancel the offering. Of the remaining nine alternatives, eight of them discuss possible deletions of areas already subject to the Moratorium, i.e., they are "subsets" of Alternative 10.[2] The remaining alternative, Alternative 9, discusses deleting blocks in the shelf-break zone, a significant portion of which is subject to the dispute pending before the International Court of Justice. Thus, in August, 1984, when the Secretary was making his decision as to what configuration the sale should take, the only alternative legally available to him was Alternative 10, selling all leases not covered by the Moratorium, including some areas subject to the Canadian Boundary dispute.[3] None of the alternatives considered in the FEIS completely eliminated all lands subject to the boundary dispute. This alone might render the FEIS inadequate, since those 1,382 (SID 33) tracts obviously form a large fraction of any of the alternatives considered. It is worth noting that, after the First Circuit's explicit discussion of the purposes and requisites of an EIS in *Commonwealth v. Watt* that the Secretary should choose to present an EIS that assumes the availability of more than 30% of the area offered although that area is subject to international litigation and may well never become available for leasing.

Had the Secretary waited only four more days, until September 30, 1984—the end of fiscal 1984 (FEIS at i)—the area subject to the Moratorium would have become available for sale (absent an extension of the Moratorium by Congress). His purpose in trying to hold the sale prior to the expiration of the Moratorium is not before this Court and need not be examined. The relevant point for purposes of the present case

---

2. These "subset" alternatives are Alternatives, 4, 5, 5–1, 6, 7, 7–1 and 8.

3. Alternative 9, which involved ignoring the request of the State Department relative to with-

holding sale of any leases in the area subject to the boundary dispute with Canada did not eliminate tracts subject to the Moratorium.

is that, given that he scheduled a sale for September, 1984, the FEIS presented only one legal option and that option included leasing part of the area subject to the boundary dispute. The sale actually scheduled for September 26, 1984, differs significantly from any of the alternatives analyzed in the FEIS. The scheduled sale covers 1,138 tracts; Alternative 9 covered 3,596 tracts; and Alternative 10 covered 1,542 blocks. Thus, the closest alternative to the actual scheduled sale that was discussed in the FEIS differs by more than 404 blocks, which is the equivalent of 2,299,972 acres (using the FEIS figures of approximately 5,693 acres per tract). FEIS at 12. The FEIS itself obviously presents no evidence that this 404 block difference is insignificant and would not have any effect on the weighing of risks and benefits that the Secretary was required to undertake.

## B. *The FEIS failed to present any significantly varied alternatives from which the Secretary could choose.*

As CLF has argued, once the illegal and overlapping alternatives are removed from the FEIS, the Secretary was presented

4. Calculating the precise percentage that adoption of Alternative 9 would reduce the land offered is complicated and depends on a number of different scenarios. Under these different scenarios, Alternative 9 represents between 11.6% and a 28.6% reduction from Alternative 10 or the proposed 25 million acre sale. These figures are derived as follows:

The proposed 25 million acre sale includes 4366 tracts. Alternative 10 would delete 1503 tracts (Proposed Notice of Sale, Admin.R. 159), resulting in a sale of 2863 tracts. If the Canadian boundary dispute tracts are also removed (1086) (*see* SID at 33) Alternative 10 would yield a sale of 1777 tracts.

Alternative 9 would delete 770 tracts. FEIS at 77. If Alternative 9 is reduced by the disputed Canadian tracts (209) (*see* SID at 33) and by the Congressional deletions (53) (*Id.*) it would yield a total, feasible deletion of 508 tracts for Alternative 9.

There are four possible permutations from this point in the calculations.

1. All of Alternative 9 (770 tracts) would delete only 17.6% of the proposed 25 million acre (4366 tract) sale.

$$\frac{770 \text{ tracts}}{4366 \text{ tracts}} = 17.6\%$$

with basically only two different configurations for the sale. The first was to lease all the land not subject to the Moratorium, including some disputed tracts (Alternative 10). The second (Alternative 9) was to lease only a slightly smaller percentage of the ocean bed.[4] Whether offering only one slightly different alternative would, as a matter of law, be sufficient under the NEPA requirements is a difficult question and one that I need not answer. For, as CLF argues, the FEIS is hopelessly skewed in favor of only small deletions from the proposed 25,000,000 acre sale. The FEIS alternatives numbered 4 through 10 propose deletions, respectively, of 249, 106, 224, 663, 985, 404, 472, 251, 770, and 1542 of the 4,366 tracts originally proposed. The largest of these alternatives—the 985, 770, and 1542 tract deletions—are the options that delete (1) some blocks subject to the Moratorium and the boundary dispute; (2) blocks in the shelf break zone, (only 508 of which are subject neither to the Moratorium nor the boundary dispute), and (3) the blocks subject to the Moratorium. Thus, assuming that the Secretary did not intend to offer tracts subject to either the Morato-

2. That part of Alternative 9 which was feasible (508) would delete 17.7% of Alternative 10 (2863).

$$\frac{508 \text{ tracts}}{2863 \text{ tracts}} = 17.7\%$$

3. That part of Alternative 9 which was feasible (508) would delete 28.6% of that part of Alternative 10 that could have been held (1777).

$$\frac{508 \text{ tracts}}{1777 \text{ tracts}} = 28.6\%$$

4. That part of Alternative 9 which was feasible (508) would delete 11.6% of the entire 25 million acre sale (4366).

$$\frac{508 \text{ tracts}}{4366 \text{ tracts}} = 11.6\%$$

A fifth version of the calculation can also be developed. Table II.A–1, FEIS at 14, shows resource estimates after various deletion alternatives, and indicates that deletion of Alternative 10 would leave 140 million barrels in the sale. The Table indicates that deletion of Alternative 9 (the only true alternative to Alternative 10) would remove only 20 million barrels (140 m–120 m). Thus, as a function of resource estimates, Alternative 9 reduces the maximum feasible sale (Alternative 10) by 14%:

$$\frac{20 \text{ tracts}}{140 \text{ tracts}} = 14\%$$

rium or the boundary dispute, the largest deletion any of the alternatives proposed that was not included in the Moratorium deletion was 508 tracts. This is the part of Alternative 9 that is not subject to the Moratorium or the boundary dispute.

Even assuming that the Secretary wanted to accept this 508 tract deletion, he would have to take Alternative 9 and "cut and paste" its assessment of the risks and benefits of proceeding. He had no way of knowing how great a decrease in environmental harms would result from deleting those 508 blocks nor what, if any, the corresponding loss of resources would be. The central flaw of the FEIS, therefore, is that it simply did not present the Secretary with *any* feasible and legal options given his apparent determination to offer a September, 1984 sale of the Georges Bank leases. As a result, it cannot be said to have "given the Secretary a reasonably adequate picture of the likely environmental harms associated with his choice." *Commonwealth v. Watt,* 716 F.2d at 950. The FEIS fails to describe any alternative closely resembling that choice.

C. *The SID and EA fail to rehabilitate the FEIS*

The Secretary might have been helped in making his choice by two other documents—the SID and the EA. Yet these documents also fail to provide the kind of accurate, detailed information he needs to balance the needs of the environment and the oil industry. As noted above, the SID (presumably published simultaneously with the FEIS) merely reiterates some of the alternatives of the FEIS, and adds two new deferral options: (1) defer offering blocks subject to the boundary dispute; and (2) defer offering 291 blocks in submarine transit lanes. This is the first analysis of the area subject to the boundary dispute, and it is afforded one page of discussion in a more than 60-page document. Nonetheless, that discussion does give the Secretary two useful pieces of information: that deferral of the 1,382 blocks would decrease mean resource estimates by 24% for oil and 20% for gas compared to the original 4,366 blocks. SID at 33. Part of this area over-laps with area affected by the Moratorium. Second, the "regional economic and environmental benefits" *not* realized by the deferrals are expected to be "minor." SID at 33. It is unclear whether this means that there are minor regional economic and environmental *benefits* as a result of the deletion or whether there will be a minor *loss* of regional economic and environmental benefits. In either case, it would be difficult for the Secretary to adequately assess the costs and benefits of the new, one-page deletion proposal.

The EA gives little additional help. I note that the EA is subtitled "A Comparison of the Area Proposed to be Offered and Alternative 10 in the Final Environmental Impact Statement." As CLF has pointed out, the more familiar one becomes with the administrative record in this case, the more obvious it is that a more useful FEIS would have taken "Alternative 10" as its starting point, rather than presumptively including 1,542 tracts subject to a Congressional moratorium and 1,086 tracts subject to an international boundary dispute. CLF brief at 9. It is difficult to see how an EIS written with two such significant assumptions in mind can constitute the requisite "detailed statement" of the actual Lease Sale 82, given that such a statement is supposed to describe the "proposed action, as well as possible alternatives to the action and their respective environmental consequences." *CLF v. Watt,* 560 F.Supp. at 568.

Substantively, the EA offers the Secretary more help in making his choice than does the SID. The EA compares the proposed sale to Alternative 10 of the FEIS (the Moratorium deletion proposal) and Governor Dukakis' proposed 400 meter isobath deletion. Attached to the EA is a "finding of no significant impact" by MMS, indicating that no supplemental impact statement is required. The EA assesses the area covered by the Proposed Notice of Sale, namely the tracts unaffected by the Moratorium less 327 blocks "identified by industry as having low or no interest" and 151 blocks deleted at the request of the Department of Defense as containing sub-

marine transit lanes. The EA separately discusses the effect of deleting from the current sale the blocks subject to the boundary dispute. Although this EA is probably more helpful than the Sale 52 EA, the changed environmental impacts are still described in very general terms:

If the area which is in dispute with Canada is deferred from the proposal, the resource estimate, amount of drill fluids, formation waters, and wastewater discharged, and number of exploration and production rigs *may decrease....* A *concomitant decrease* in projected impacts to the benthic community resulting from oil spills or drilling discharges would be expected.

EA at 6, 7 (emphasis added).

The discussion of Governor Dukakis' 400 meter deletion request is even less detailed.[5]

By deferring all blocks in water shallower than 400 m. there would be no blocks adjacent to the Georges Bank crest. Thus, the probability of oil entering and causing water quality degradation in the important crest area, as a result of a large spill in another part of the sale area, *is further reduced. Some decrease* in potential impact from large accidental oil spills and routine discharges would result in accordance with a decrease in the number of drilling rigs and platforms per this deferral.... The deferral *would reduce* potential impacts to the benthic communities because of the probable decrease in amounts of drill mud discharged and the lower benthic productivity in blocks deeper than 400 m.... [The offshore lobster fishery] would lose *less* fishing space to OCS related facilities if only blocks deeper than 400 m. were offered.

EA at 18, 20 (emphasis added).

As the First Circuit noted in discussing the Sale 52 EA, there is no way the Secretary could estimate how great a reduction in environmental damage would occur if this proposal were adopted. There is no indication that the risks decrease proportionally with the acreage eliminated from the lease. On the contrary, the FEIS and other documents make clear that the crest area of Georges Bank is one of the most environmentally sensitive and important parts of the region. The logical conclusion is that reduction in risk is not proportional to reduction in acreage. Thus the Secretary did not have the accurate, detailed picture of risks and benefits in front of him that NEPA requires when he made his decision in August, 1984, to proceed with the sale.

Even if I am incorrect in my finding that the EA and SID were insufficiently detailed to meet NEPA's requirements, nonetheless, as a matter of law, those documents cannot meet NEPA's EIS requirement:

[I]t was argued that the EA itself (or the SID and EA together) constitutes an adequate supplement. We have previously explained why we think that the EA did not contain enough information or analysis to inform the Secretary of the magnitude of the change in environmental harm. But, even if we are wrong, the EA and SID are legally insufficient as FEIS supplements, for they were not made public until the beginning of this litigation. As we have previously held, unless a document has been publicly circulated and available for public comment, it does not satisfy NEPA's EIS requirements.

*Commonwealth v. Watt,* 716 F.2d at 951 (citations omitted).

In this case, the EA was published on Friday, August 24, 1984, two days before the final notice of sale was published in the Federal Register and only just over a month before the scheduled sale date. It is the only document to discuss at any length the effect of deletion of the blocks subject

---

5. Much has been made by the government and the intervenors of the supposed lateness of Governor Dukakis' recommendation regarding deletion of all tracts lying within the 400 meter isobath. I note that even if this procedural argument has any merit (The Governor's request was submitted pursuant to OCSLA, rather than to NEPA), MMS felt the request had sufficient merit to require discussion in the EA.

to the boundary dispute and the only document to discuss Governor Dukakis' 400 meter request. I have been unable to find any indication in the record of the publication date, if any, of the SID. In any event, there was no public circulation or comment on the EA within the First Circuit's *Commonwealth v. Watt* holding. As a result, neither the EA nor the SID can be said to have cured the deficiencies of the FEIS. "Under these circumstances, we do not see how the FEIS can be said to have given the Secretary a reasonably adequate picture of the likely environmental harms associated with his choice." *Id.* at 950. Therefore, as in the Sale 52 case, the DOI's decision not to supplement the FEIS seems unreasonable. *Id.*

D. *The FEIS attempted to cover too large an area to be adequately site specific.*

■ The plaintiffs' broader claim is that, even assuming the FEIS presented an accurate picture of the sale actually scheduled and that it analyzed a sufficiently wide and sensitive set of alternatives, it would still fail because no FEIS can adequately cover a 25,000,000 acre tract of ocean. In the abstract, this is a difficult legal question to answer. As applied to these 25,000,000 acres, however, the answer is obvious. This region is one of the most important and ecologically diverse in the Atlantic. Its submarine topography is highly varied, ranging from the relatively flat and shallow portions of Georges Bank itself to the steep submarine canyons and the less steeply inclined continental rise. The government has supplied a vast array of tidal charts, biology opinions, contour charts, geology descriptions, and resource estimates. Most telling, however, is the fact that this enormous proposed lease area completely subsumes prior sales 42 and 52. Those earlier sales form only a *small fraction* of the area the Secretary now intends to lease under the cover of only one EIS. We may well ask the following questions. How can the DOI accurately estimate the impacts of exploration on this massive area in only one document which is not much longer than those prepared for the prior

sales? How can it present adequate and sensitive alternatives for areas subject to both a Congressional moratorium and the vagaries of international litigation? Most importantly, how can this Court rest assured that the specific and harmful impacts that may be felt by the most admittedly delicate part of this huge tract will receive adequate and separate analysis and protection when it is buried, or "diluted," in such an enormous plan? Although this is not to say that an EIS could never adequately describe an area of this size, in this particular case I believe the plaintiffs are correct in their assertion that a single EIS cannot adequately assess the potential harms of exploration under a sufficient number of alternative proposals for this sensitive and varied area. I repeat my earlier comment that the special nature of the Georges Bank region will continue to require environmental assessment apart from and in addition to the FEIS for the 1984 lease offering. *See, e.g., Oregon Environmental Council v. Kunzman,* 714 F.2d 901, 20 ERC 1007, 1010 (9th Cir.1983) (aerial spraying to eradicate gypsy moth infestation based on programmatic EIS and environmental assessment was unreasonable where those studies did not provide site-specific information). For this additional reason, I find that the FEIS fails to satisfy the requirements of NEPA.

IV.

*The Outer Continental Shelf Lands Act*

The Commonwealth and CLF claim the Secretary has acted in derogation of Section 19 of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1345. Specifically, the Commonwealth argues the Secretary's decision to reject the recommendations of the Governor of Massachusetts set forth in a July 3, 1984 letter was "arbitrary and capricious." Before addressing this claim, a brief review of Section 19 of OCSLA is necessary.

■ Section 19 of the OCSLA Amendments of 1978 was designed "to insure that Governors of affected States ... have a leading role in OCS decisions and particu-

larly as to potential lease sales and development and production plans." H.Rep. 95–590 at 152 (1978) *reprinted in* U.S.Code Cong. & Ad.News 1450, 1558 (1978). In furtherance of this goal, Section 19 provides that a Governor of a state affected by an outer continental shelf lease sale may "submit recommendations to the Secretary regarding the size, timing or location of a proposed sale." 43 U.S.C. § 1345(a). Once submitted to the Secretary, the Governor's recommendations are conditionally binding. 43 U.S.C. § 1345(c). As the Supreme Court has noted, under Section 19, "Interior is required to accept these recommendations if it determines they strike a reasonable balance between the national interests and the well-being of the citizens of the affected State." *Secretary of Interior v. California,* — U.S. ——, 104 S.Ct. 565, 670, 78 L.Ed.2d 496 (1984). The Secretary's decision to accept or reject the Governor's recommendation must be communicated to the Governor in writing. 43 U.S.C. § 1345(d). Consequently, the determination may be overturned on judicial review only if found to be "arbitrary and capricious." *Id.*

The mechanics of Section 19 are not complicated. The statute clearly does not vest the Governor of an affected state with the power to veto a planned OCS lease sale. H.Rep. 95–590 at 153 (1979) *reprinted in* U.S.Code Cong. & Ad.News 1450, 1559 (1978). Rather, the Governor's advice enjoys a preeminent role in the Secretary's decision-making process. It is to be given "full and careful consideration and be incorporated into the ultimate decision of the Secretary." *Id.* Indeed, the Secretary is compelled to accept the Governor's recommendations if they represent a "reasonable balance between the national interest and the well-being of the citizens of the affected state." 43 U.S.C. § 1345(c). The "reasonable balance" sought by Congress through OCSLA incorporated the need for oil and gas to be "developed in a manner which takes into consideration the Nation's long range energy needs and also assures adequate protection of the renewable resources of the OCS which are a continuing and increasingly important source of food

and protein to the Nation and the world." 43 U.S.C. § 1801(14). With this backdrop of Section 19 in mind, I turn to the facts underlying the Commonwealth's claim.

Pursuant to Section 19 of OCSLA, Governor Dukakis forwarded a letter to Secretary Clark on July 3, 1984. Admin.R. 175. The Governor advised the Secretary to delete from Lease Sale 82 all tracts within the 400 meter isobath. The Governor cited the tremendous value of the fishery contained within the 400 meter isobath as the primary reason for his request. Mindful of the balancing imposed under OCSLA, the Governor articulated his conclusion that the preservation of a fragile, but proven billion dollar resource for the Commonwealth and the Nation found within the 400 meter isobath outweighed any national interest in the speculative hydrocarbon exploration of this distinct area. The Governor also reminded the Secretary that the area outside the 400 meter isobath which would be subject to leasing once his recommendation was adopted consisted of some eight million acres. This area includes the "carbonate reef platform complex," a location deemed to be "favorable for the accumulation of petroleum" by the Minerals Management Service. Admin.R. 175 at 7, citing FEIS at 96.

The Secretary responded to the Governor's concerns in writing by a letter dated August 22, 1984. Admin.R. 198. The letter revealed the deferrals Interior had made in the Lease Sale 82 area after examining information related to the sale in the Governor's letter. Specifically, Interior informed Governor Dukakis that all blocks falling within an area involved in a boundary dispute with Canada and presently pending before the International Court of Justice would be deferred until that dispute is resolved. In addition, the letter stated that Interior had added several blocks to an area within the 60 meter isobath covered by Congress' leasing moratorium. These blocks had been erroneously omitted from a geological survey. Interior's letter also announced a deferral of "all blocks in the northeast peak of Georges Bank which is an area of concern identified in letters from

the Governors of Maine, New Hampshire, Massachusetts [6] and New Jersey." According to the letter, the Secretary was also deferring 32 blocks identified as "high priority" by the industry at the request of the Coast Guard and 293 "blocks of less than high priority to the industry" which lie within the 400 meter isobath zone suggested by Massachusetts. Finally, Interior's letter informed the Governor that despite his recommendations, "149 blocks in water depths of 400 meters or less that have been identified as high priority to the industry" would be offered in Lease Sale 82.

In sum, the Governor's recommendations were partially rejected and partially accepted. Interior attached to its response letter a "Discussion of the Recommendations" which outlined the reasons why the Secretary adopted part of the Governor's 400 meter isobath suggestion, but refused to adopt it *in toto*. *Id.* at 4.

In the present matter, the Commonwealth contends the Secretary's decision to reject the Governor's OCSLA Section 19 recommendation and lease 149 tracts within the 400 meter isobath "does not conform to the requirements of the statute." Commonwealth's Brief at 25. Briefly summarized, the Commonwealth believes the Secretary did not engage in the appropriate balancing under OCSLA before choosing to reject the Governor's conditionally binding recommendation. The Commonwealth asserts the Secretary deleted certain blocks within the 400 meter zone proposed by the Governor for reasons other than the environmental and fishery concerns voiced by the Governor. Accordingly, the Commonwealth maintains the Secretary's decision to contradict the Governor's recommendation and lease 149 tracts within the 400 meter isobath was "arbitrary and capricious."

Under OCSLA, as discussed above, the Secretary was compelled to accept the Governor's recommendation unless he found the request did not strike a "reasonable balance" between the national interest embodied in OCSLA and the well-being of the citizens of Massachusetts. OCSLA represents Congress' desire "to balance orderly energy resource development with the protection of the human, marine and coastal environments." 43 U.S.C. § 1802(2)(B). Interior's letter to the Governor was replete with references to this balancing as it described the Secretary's apparent concessions to the Governor's requests, as well as the Secretary's reasons for disregarding parts of the request. Upon closer examination, however, the record reveals that while the balancing standard was recited by the Secretary, little if any actual balancing of the difficult competing interests identified by Congress in OCSLA occurred. In virtually every instance where the Governor's expressed interest in protecting the Georges Bank fishery for the citizens of the Commonwealth and the nation conflicted with an expression of high oil interest, the Governor's plea was rejected.

Nevertheless, Interior stands by its Section 19 response and claims that deferrals made in the 400 meter zone were the result of careful balancing of the competing state and national interest. Each of these deferrals, however, did not present a situation in which the Secretary had to balance the propriety of leasing an area of high industry interest—and hence likely drilling activity—with the Governor's equally salient interest in preserving the fishery in that same area. A few examples will illustrate this point.

First, Interior's "Discussion of Recommendations" which accompanied the Section 19 response letter to the Governor states "the 221 blocks in the northeast peak that were included in the proposed Notice of Sale have been deferred. This action was taken in recognition of the States' concerns...." The Secretary's brief in this matter stresses the northeast peak deferral. Secretary's Brief at 54, 57. Similarly, the intervenors discuss the removal of the northeast peak area at length and state, "[t]he northeast peak tracts

---

6. The northeast peak is included in the area within the 400 meter isobath recommended for deletion by Governor Dukakis. The Governor's Section 19 letter specifically emphasized the importance of the northeast portion of Georges Bank to the Massachusetts fishing industry.

were deleted from the sale because of their high fishery values and the concern expressed by the States, notwithstanding significant industry interest in their leasing." Intervenor Defendants' Brief at 14. According to the defendants' submissions, therefore, the Secretary engaged in an appropriate balancing under OCSLA: the Commonwealth's interest in preserving the scallop industry was weighed against industry expressions of significant interest. As a result, the defendants say, 221 tracts were deferred as Massachusetts had demanded.

However, this is not an entirely accurate recital of the facts. Instead of being the result of a careful balancing of equal, competing interests, the Secretary's decision to defer 221 tracts in the northeast peak was not really his choice at all. All but 12 of those 221 tracts are located in the area of boundary dispute with Canada. The Department of State instructed Interior to defer all of these tracts pending disposition of the case by the International Court of Justice. See Admin.R. 147.

Thus, unlike a situation in which the Commonwealth's expression of a significant interest in an area and industry's considerable exploration interest in that same area are the only factors to be weighed by the Secretary, the State Department skewed the balancing so greatly the Secretary's choice regarding all but 12 of the northeast peak tracts[7] was pre-determined.

Second, the Secretary mentions the 32 "high industry interest" tracts within the 400 meter area outlined by the Governor that were deferred from Lease Sale 82. Secretary's Brief at 54, 57, 63. Again, deferral of these blocks was not the product of balancing nor a recognition of the Governor's concerns in this area of "high industry interest." Rather, the United States Coast Guard entered a specific request with the Secretary to defer these 32 blocks for navigational reasons. Admin.R. 165 at 1. Thus, like the tracts within the Canadian boundary area deferred at the State Department's demand, the Secretary had no opportunity to balance the Commonwealth's concerns with the industry's desires in this high priority area. Instead, another federal executive agency determined the Secretary's decision. Interestingly, 47 "high priority" blocks immediately adjacent to the Coast Guard area, and well within the 400 meter isobath deletion area sought by the Governor are offered for lease.

Third, the Secretary argues "293 blocks lying in water depths of less than 400 meters were deferred because of the State's expressed concerns and because industry

---

7. The remaining 12 tracts in the northeast peak area fall westward of the disputed Canadian boundary line. They are labelled tracts of high industry priority. See Secretary's brief at 54. Nevertheless, several aspects of the record indicate the northeast peak area may not be a promising area for hydrocarbon development. Consequently, the Secretary may not have been weighing truly high priority areas when these 12 blocks were balanced against Massachusetts' interest.

For example, the resource estimates for oil and gas production under various alternative leasing patterns in the FEIS show the northeast peak area may have no oil. FEIS at 14. The estimate resources projected under Alternative 6 (deletion of Central Georges Bank) and Alternative 6.1 (deletion of Central Georges Bank and the Northeast Peak) are identical for both oil and gas. Id. Furthermore, the memorandum from the MMS encouraging the Secretary to lease only 149 tracts of high priority within the 400 meter isobath articulated a bleak outlook for the tracts in the northeast peak. In that memorandum, Asst. Sec. Power informed the Secretary, "[O]ther blocks were deferred after balancing the fisheries and environmental concerns with the lower level of oil and gas industry interest in portions of Georges Bank, including the northeast peak area. Admin.Rec. 195 at 3 (emphasis added). See also Memorandum to Assoc. Director of Offshore Minerals Management, Admin.Rec. 181, at 2 ("The western portion [of the northeast peak] located in the Franklin Basin appears to contain only stratographic traps and is therefore not as prospective.").

In sum, given the doubts expressed in the record regarding the promise of the northeast peak, the deferral of 12 "high priority" tracts within the peak area does not bolster the Secretary's argument that the 221 peak blocks were deferred "in recognition of state's concerns." Admin.Rec. 198 at 4. Rather, facts indicate the oil industry interest side of the Secretary's balancing formula may have been considerably lightened.

had not indicated that they were of high priority." Secretary's Brief at 57. The Intervenor defendants also point to this deferral and claim Interior "went the extra step of deleting 293 more 400 meter isobath tracts as to which industry had not assigned the highest priority." Intervenors' Brief at 17. Under the defendants' view, Interior weighed the Commonwealth's concerns for these 293 blocks within the 400 meter isobath against the industry's less than enthusiastic interest in these tracts and acceded to the Commonwealth's request. I do not believe this is the type of "reasonable balance" envisioned by Congress under OCSLA.

The blocks deferred by the Secretary were labelled either areas of "medium priority" or merely "areas of interest" by the industry. The Secretary, therefore, weighed industry's unpromising view of these tracts against the Governor's notable concern for all tracts within the 400 meter isobath. The outcome of the Secretary's purported "balancing" ostensibly supported the Governor's position. Nonetheless, the factors weighed by the Secretary do not withstand scrutiny. Were the interests of the Commonwealth and the oil industry with regard to these 293 blocks equally compelling? Hardly, given the low level of expressed industry desire. Is the likelihood of an environmental disaster greater in these 293 areas of lower industry interest than it is in the adjacent 149 areas of "high industry interest" where exploration is probable? Only an affirmative answer to this inquiry would support the Secretary's decision to approve of the Commonwealth's concerns in low interest areas, but disregard those concerns in the remaining high interest areas. In sum, therefore, I fail to see the reasoning through which the Secretary found the Governor's 400 meter recommendation to be "a reasonable balance between the national interest and the well being of the

citizens of" the Commonwealth with regard to "293 blocks of less than high priority," but not with regard to 149 areas of high industry priority.

■ The Secretary's mandate under OCSLA is clear. He must accept the Governor's recommendations unless he finds the recommendations do not provide a "reasonable balance" between the national interest embodied in OCSLA and the well being of the citizens of the Commonwealth. This "reasonable balance" represents a resolution of the conflict "between exploitation of the oil and gas resources in the Outer Continental Shelf and other uses of the marine environment including fish and shellfish growth and recovery." 43 U.S.C. § 1801(13). The record submitted by the parties in this case reveals Interior's curious view of the "reasonable balance" sought by Congress. Each time the Secretary reviewed a conflict between a demonstrated expression of high industry interest in an area within the 400 meter isobath, and the Governor's interest in preserving the delicate, abundant marine resource in that area, the Secretary acceded to industry and found the Governor's request unreasonable. I believe the examples of balancing offered by the Secretary in this matter, as I have described above, skirt the critical issue identified by Congress: the inevitable conflict between industry's legitimate, Congressionally sanctioned desire to exploit oil and gas deposits on the outer continental shelf and the state's interest in preserving unique marine resources. Thus, the Secretary's balancing should have begun with the 149 high industry tracts slated for lease within the Governor's suggested deletion zone rather than ending with them. Accordingly, I find the Secretary's determination to reject the Governor of Massachusetts' recommendations under Section 19 of OCSLA was arbitrary and capricious and thus violated the Outer Continental Shelf Lands Act.[8]

8. Interior went to great pains to discredit the deletion zone within the 400 meter isobath recommended by the Governor. In the "Discussion of Recommendations" forwarded to the Governor along with Interior's Section 19 letter, Interior reminded the Governor that Massachu-

setts had previously sponsored a deletion zone within the 200 meter isobath. Admin.R. 198 at 5. Next, Interior belittles the Commonwealth's reliance on information gleaned from pleadings submitted to the ICJ to support their requested deletion of all Georges Bank tracts within the

## V.

*Appropriateness of Preliminary Injunctive Relief*

■ As the discussion above indicates, I find the plaintiffs' have demonstrated a likelihood of success on the merits. This, of course, is only the first prong of the test for determining whether a preliminary injunction should issue. The plaintiffs bear the additional burden of proving that they will suffer irreparable harm if the sale is not enjoined, that the balance of equities favors the granting of the injunction, and that the public interest will not be harmed by the issuance of an injunction. *CLF v. Watt,* 560 F.Supp. at 581, 582.

Since this case so closely resembles the one before this Court in the Sale 52 litigation, it is helpful to refer to my opinion in that case as a background for the discussion of the appropriateness of granting preliminary injunctive relief. Rather than repeat my findings there, I will note that certain additional facts are relevant to this case.

### 1. *Irreparable Harm*

The First Circuit opinion in the Sale 52 case holds that "a plaintiff seeking an injunction cannot be stopped at the *threshold* by pointing to additional steps between the governmental decision and environmental harm." *Commonwealth v. Watt,* 716 F.2d at 952 (emphasis in original). It is clear, therefore, that the law of this Circuit is that a mere sale of leases can constitute irreparable harm if the sale does not comply with NEPA requirements. In this case, the Court is faced with a threat even more egregious than that in Sale 52, one not just to the specific Georges Bank area, however defined, but to 25,000,000 acres of ocean

400 meter isobath. "Georges Bank," Interior explains, "was defined as the area within the 100 fathom (183 meter) isobath" in the ICJ papers. *Id.* at 6. According to Interior the pleadings do not refer to the 400 meter isobath as "having any significance for the protection of fisheries." *Id.*

It seems Interior concedes the area known as "Georges Bank" is roughly that area bounded by the 200 meter isobath or the 183 meter isobath (a difference of 17 meters in depth). After reviewing a chart of the area supplied by Interi-

bed. There is no indication in the record that Georges Bank has ceased to be an important regional, national, and even world resource. There is also, of course, no indication that the proposed exploration and production activities pose no risk to that important resource. I need not reiterate the economic, social, and environmental importance of this region to citizens of the Commonwealth. I find that the plaintiffs have adequately demonstrated the likelihood of irreparable harm should this sale take place.

### 2. *Balance of Equities*

Plaintiffs bear the burden of proving that the harm that they will suffer in the absence of injunctive relief is greater than the harm that the defendants will suffer if the injunction issues. In this case, as discussed at length above, the plaintiffs have demonstrated the likelihood that a serious risk is being improperly imposed on a precious and delicate natural resource. The defendants have failed to present any evidence of a serious countervailing harm; at best, they will suffer some delay until a new and proper EIS can be prepared. As noted in the prior litigation over Sale 52:

> The resources, if they are there, will remain intact. The technology, both as to resource extraction and as to environmental preservation, can only improve.

*CLF v. Watt,* 560 F.Supp. at 582. I therefore find that the equities favor the granting of the injunction.

### 3. *The Public Interest*

Finally, plaintiffs must also prove that the public interest will not be harmed by the issuance of the injunction. Clearly two

or at the hearing, MMS Map 2, I note that the 400 meter isobath and the 200 meter isobath nearly merge in many critical areas and at no point are the two separated by a distance of more than approximately five nautical miles. I also note that portions of the Congressional moratorium apply to areas both within and beyond the 400 meter isobath. Nevertheless, I will not attempt to resolve the parties' dispute over a definitive boundary for the Georges Bank area.

 

different but perhaps equally important public interests are at stake here. This conflict or perhaps uncertainty is best evidenced in the conflicting mandates sent from the United States Congress to the Secretary of the Interior: on the one hand he is required to establish an orderly program of off shore resource development; on the other, he is specifically forbidden to lease areas of great environmental sensitivity.[9] His is neither an easy nor an enviable task. He is nonetheless required to carry out that task in strict compliance with environmental statutes. *National Wildlife Federation v. Andrus*, 440 F.Supp. 1245, 1256 (D.D.C.1977). Because I find that the risk to an enormous and important tract of the Atlantic Ocean bed is of relatively greater risk to the public interest than a delay in the hasty leasing of those lands in the absence of any indication that any, let alone large quantities, of non-renewable resources will be there, I find that the public interest will not be harmed by the granting of the injunction.

## CONCLUSION

For the reasons stated above, I find that the plaintiffs have demonstrated a likelihood of success on the merits of their claims that they are likely to suffer irreparable harm in the absence of an injunction, that the balance of the equities favors the granting of a preliminary injunction, and that such an injunction would not be to the detriment of the public interest.

Accordingly, a preliminary injunction has been issued restraining the Secretary of the Interior and the Department of the Interior from conducting Part I, Lease Sale 82, a sale of oil and gas leases currently scheduled for September 26, 1984.

SO ORDERED.

## ADDENDUM

Because of the press of time, I followed the same procedure in this case as I did in

Lease Sale 52. I issued the preliminary injunction at 11:30 A.M. on September 25, 1984 and noted therein that my Memorandum and Order would follow. I notified counsel of my decision in order to provide them with as much time as possible to commence any appeal process.

Subsequent to notifying counsel, the Secretary filed a "Critical New Information," stating that because only 149 bids were received, all from one of the plaintiffs in this case, and there were no bids from any of the oil companies, it was unnecessary to act on the motion for preliminary injunction.

At the hastily convened hearing at 4:15 P.M., the Secretary stated that Lease Sale 82 scheduled for September 26, 1984 had been cancelled and urged that, upon reconsideration, I deny the motion for preliminary injunction because the issues were now moot.

I decline to do so, first, because my order had issued. Also, only Part I of Sale 82 was cancelled; the future as to Part II is uncertain. As stated earlier, the Moratorium expires on September 30, 1984, and the boundary dispute has not been resolved. Therefore, I suggested the Secretary should file appropriate motions to dismiss, as he did when Lease Sale 52 was cancelled, and I will rule on them. *See CLF v. Watt*, 586 F.Supp. 1238 (D.Mass.1984).

**9.** The Secretary attached only selective portions of the Counter-Memorial filed by the United States before the International Court of Justice. A fairer picture can be derived from the more complete excerpts from that Counter-Memorial which expresses the concerns of the United States over damage to the marine resources of Georges Bank from an oil discharge.